## MEYER et al. v. CADWALADER, Collector.[1]

### (Circuit Court, E. D. Pennsylvania. December 8, 1891.)

**1. NEW TRIAL—NEWSPAPER COMMENTS DURING TRIAL—PUBLISHED REPORTS OF INTERVIEWS WITH PARTIES.**
   Where evidently inspired newspaper comments and reports of interviews, of so gross a nature as to be well calculated to prejudice a jury against one of the parties to a cause, have been published during a trial, and presumably seen by the jury, a new trial will be granted where the verdict is against the parties attacked.

**SAME—PRESUMPTION THAT JURY READ ARTICLES.**
   Where, during a trial extending over several days, the jury separating after each daily session, leading newspapers in the city in which the trial was taking place published matter calculated to prejudice the jury against one of the parties, it will be presumed that the jury saw the matter published.

**3. SAME—WAIVER OF OBJECTION.**
   After the publication during a trial of the first of a series of newspaper articles reflecting against one of the parties, motion by that party was made for withdrawal of a juror and a continuance, which motion was refused. Held, that he was not bound to renew his motion upon the subsequent publication of other and more offensive articles, and that his failure to do so was no ground for refusing his application for a new trial.

At Law.

This was a motion by plaintiffs for a new trial in an action at law to recover an excess of duty alleged to have been exacted on hat trimmings. Reported, 49 Fed. Rep. 26. The grounds of the motion were that the verdict was against the weight of the evidence, and that, during the progress of the trial, statements had been publicly made on behalf of defendant calculated to prejudice the minds of the jury. In support of the latter ground, various newspaper articles and reports were relied on. Of these, the two following, published during the trial in leading daily newspapers, will serve as illustrations:

"The Twenty-Million Raid on the Treasury—Special Agent Hanlon Tells Some of Its Inner History—The Twelve Contested Samples under Close Scrutiny—Silks, Dress Trimmings, Ruchings, Linings, and Almost Everything Else Imported, Asked to be Classified as Hat Trimmings, to the Great Loss of the Government.

"There was much comment in mercantile circles yesterday over the verdict in the celebrated *Hat-Trimmings Case,* decided on Friday against the government. The prompt notice of government officials that the case would be appealed was not a surprise to the victors in the first stage of the warfare, while those who had battled to save the government millions of dollars were confident that the verdict would not stand. Among those who, officially, have given the subject under dispute the gravest study, is Special Agent Marcus Hanlon. He plainly showed yesterday how earnest he was in his endeavor to prove that the suits of the importers were such as should not secure verdicts for them from intelligent jurymen, and, concerning the cases now on trial, said: 'I am only too glad to give my views, as I think that the people should know all of the facts in this attempt to loot the United States treasury. The issue is simply a question of fact,—whether the goods were chiefly used for making or ornamenting hats. There is no question of law involved; all such questions having been raised in the case that was decided on Friday.

[1] Reported by Mark Wilks Collet, Esq., of the Philadelphia bar.

There are twelve samples in the case now on trial. Samples Nos. 1, 2, and 3 are ribbons; No. 1 being cotton-back velvet ribbons, the same as those in the *Langfeldt Case,* and cannot be seriously claimed by the importers as hat trimmings. In fact, they have said that they would abandon them.'

### "MYSTERIES TO BE EXPOSED.

"Being asked if he meant to imply that the ribbons which were the subject of the supreme court's decision in the *Langfeldt Case* were not hat trimmings, notwithstanding the decision, Mr. Hanlon said: 'I do, most assuredly; and the jury in that case found that they were not chiefly used for making or ornamenting hats. It was one of the many mysteries that have occurred in these hat-trimming litigations, which I will expose when this case is decided.' The second sample in the present case is of silk and cotton binding ribbons, chiefly used for binding blankets. The third is a plain black satin velvet ribbon, seventeen to twenty-six lines, or about one and a half to two inches wide, almost exclusively used for dress trimmings, as every woman in America knows. Of course, an infinitesimal quantity may be used for trimming ladies' hats.

### "SOME GAUZY EXCUSES.

"The next class of goods consists of samples 4, 5, 6, 7, and 8. No. 4 is a silk guipure gauze, about eighteen inches wide, chiefly used for dress purposes, as every dressmaker can testify, but considerable of it is used occasionally, when fashion dictates, for hat materials or trimmings; but that is not anything like its chief use. Sample No. 5 is silk and wool crepes, almost exclusively used for dress purposes. The same applies to samples 6 and 8, which are silk crepons and crepes, nineteen and nineteen and a half inches wide. I do not think a fashionable dressmaker can be found in the United States to testify that these are used to any extent for trimming or making hats. They are well-known dress materials, beyond a question. Sample No. 7 is thirty-six inch crepe lisse, a well-known article, principally used for making ruchings; and it is an audacious thing for any person to claim they are chiefly used for hat trimmings.

### "MR. TREMAINE'S CHANGE OF HEART.

"Sample No. 9 is white and colored satins, seventeen and one-half to twenty-four inches wide. Almost every man and woman knows that these goods are chiefly used for linings or dress purposes, and the small percentage of these importations used in lining men's hats gives no warrant for importers to claim that their chief use is for hat trimmings. In fact, Mr. Tremaine, the chief lawyer for the hat-trimming syndicate, told Mr. Corbett, assistant appraiser at New York, (at least, so Mr. Corbett has repeatedly told me,) that, just before the board of local appraisers decided that they were hat trimmings, Mr. Tremaine stated that the importers did not claim, nor did they expect to have, colored satins seventeen and one-half to twenty-four inches wide classed as hat materials; but he now comes here, and will vigorously contest that they are. Samples Nos. 10, 11, and 12 are common chappe plushes and velvets. No. 10 is an eighteen-inch plush; the chief use being for dresses and dress trimmings and manufacturing purposes, such as albums, etc. No. 11 is fifteen and one-half, sixteen, and eighteen inch colored velvets, chiefly used for dresses and dress purposes, scarcely ever used either as hat materials or trimmings, except a small quantity for children's hats. The same applies to sample No. 12, which is fifteen and one-half, sixteen, and eighteen inch black velvets; being always used for dress trimmings and dress purposes. Mr. Hanlon says that regarding satins, velvets, and plushes the government will present overwhelming evidence from every leading dry-goods house, from Chicago to Boston, that they are not chiefly used for hat trimmings.

'It must be remembered,' concluded the special agent, 'that this is not a fight of the treasury department alone to protect the United States treasury, as every citizen of the United States is as much interested as the government. At the same time, I want to be distinctly understood that if Meyer and Dickinson can find people to prove that these twelve samples, or any of them, are chiefly used for hat trimmings, they can rely on it that I will give them all of the aid in my power to obtain their money.'"

"The Customs Decisions—Millions of Dollars Recovered from the Government on Technical Errors in Tariff Laws—Costly Hat-Trimming Cases—Sharp Attorneys Who Prosecute Claims on Contingent Fees—The Claimant Sometimes Gets Fifty Per Cent., and Sometimes Even Less.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"In the *Hat-Trimming Case* there was no question of the intent of the law-making power. Under the act of March 3, 1883, hat trimmings were made dutiable at twenty per cent., and manufactured silks at fifty per cent. A reference to the debates of congress, or to the minutes of the committee on ways and means, would show that congress intended that silks, whether used for hat trimmings or for any other purpose, were intended to pay a duty of fifty per cent. The treasury department interpreted the law in this way, and collected duty at fifty per cent. A sharp attorney saw the technical flaw in the act, and undertook to prosecute the claim for the difference between fifty per cent. and twenty per cent. The suit has been successful, and the claimants, who have paid duty on these goods for many years at fifty per cent. under the treasury decision, will recover millions of dollars, of which it is understood the attorneys in the case will receive fifty per cent. It is, indeed, a phenomenal case, in which the attorneys' fees aggregate possibly $10,000,000. Chief Special Agent Tingle, of the treasury department, speaking of the result of this suit, said to me a few days ago: 'There is a multitude of such cases coming before the department every year. There is no justice in them, for the importer has already sold his goods to the consumer on the basis of a fifty per cent. duty. This duty has been paid by the consumer, therefore, and what the importer recovers from the government is simply an additional profit to him. . If the tariff is ever a tax upon the people, it is in such a case as this. If these people had an equitable claim against the government,—that is, if they felt they had been obliged to pay an unjust duty,—they would hire an attorney, as any other claimant would, and go to law about it. But, instead of doing this, they listen to some attorney who thinks he has found a technical flaw in the law, and, as the suit costs them nothing, they allow it to be brought in their names. The chances are against their recovering; but the litigation costs nothing, and so the fifty per cent. of their claim, if they recover it, is so much clear profit.' &ast; &ast; &ast;"

After the appearance of the first of the newspaper articles published, a motion was made to withdraw a juror and continue the case. This motion was denied. Afterwards, articles of the same tenor, and more objectionable, continued to be published; but no further motion for continuance was made. The verdict was in favor of plaintiff only for a small amount admitted by defendant to be due, and was a practical defeat of plaintiff on the issues of fact disputed.

*Frank P. Prichard* and *Henry E. Tremain*, (*Cyrus E. Woods, Harry T. Kingston, Augustus R. Stanwood*, and *John G. Johnson*, with them,) for plaintiff, cited Hil. New Trials, 202; 2 Grah. & W. New Trials, p. 484.

*John R. Read,* U. S. Atty., and *William H. Taft,* Sol. Gen., (*W. W. Carr,* Asst. U. S. Atty., and *W. P. Hepburn,* Sol. of Treasury, with them,) for defendant.

There is no presumption that the jury read the articles. *U. S.* v. *McKee,* 3 Cent. Law J. 258. Plaintiffs, by allowing the trial to proceed without renewing their objection, waived the right to move for a new trial on that ground. *Davis* v. *Allen,* 11 Pick. 468; *McCorkle* v. *Binns,* 5 Bin. 348; *Fessenden* v. *Sager,* 53 Me. 536; *Bulliner* v. *People,* 95 Ill. 394; *Hunter* v. *Georgia,* 43 Ga. 483.

ACHESON, Circuit Judge. This action was brought by importers against the collector of the port of Philadelphia to recover back an alleged excess of duties paid under protest upon certain imported goods claimed by the plaintiffs to be "trimmings," chiefly "used for making or ornamenting hats, bonnets, and hoods." As to all the articles involved in the suit, upon which there was any controversy before the jury, the verdict was for the defendant. The plaintiffs move for a new trial, and in support of their motion assign several reasons. But, in the view the court takes of the case, it is only necessary to consider one of these reasons, which is based upon the fact, that, during the course of the trial statements highly prejudicial to the plaintiffs appeared from time to time in several daily newspapers of large circulation and influence published at the place of trial; some of these statements purporting to have been made to the newspapers by government officials, and all of them calculated to bias the minds of the jury, and prevent them from rendering a fair and impartial decision. The general character of all these publications can be inferred from the following head-lines, which appeared over an article relating to the trial, published while it was in progress, namely: "Importers and the Government;" "Blocking the Twenty Million Dollars Raid on the Treasury;" "Experts Give Testimony;" "Practical Business Men Come to the Aid of the Treasury, and Help to Shatter the Raiders' Claims." Another publication, during the trial, which was a special dispatch from Washington, and purported to quote remarks of the chief special agent of the treasury department to the newspaper reporter, condemning as unjust, for reasons stated, claims of importers to recover back excess of duties exacted from them, had, in conspicuous letters, these introductory head-lines: "The Custom's Decisions;" "Sharp Attorneys who Prosecute Claims on Contingent Fees;" "Millions of Dollars Recovered from the Government on Technical Errors in Tariff Laws;" "Costly Hat-Trimming Cases;" "The Claimant Sometimes Gets 50 per Cent. and Sometimes Even Less." These striking head-lines are indications of the character of the statements which followed.

But the most objectionable of all these publications was what purported to be an interview between the newspaper reporter and a special agent of the treasury department, who seems to have had charge of the preparation of the government's case, and who was present at the trial. This interview, in substantially the same form, appeared on the same day in the issue of two different newspapers, and the statements therein contained, as coming from this government official, bear marks of very

deliberate preparation. This official, as reported, undertook, in a newspaper interview intended for publication, to discuss the merits of the case on trial with respect to each particular kind of goods involved in the controversy, and to pronounce that their chief use was for other specified purposes than the trimming of hats, stating facts to support his assertions; and he further stated that one of the plaintiffs' counsel, whose name was given, and who was described as "the chief lawyer for the hat-trimming syndicate," had declared to a certain named government appraiser that the importers did not claim nor expect to have certain satins in controversy in this case classed as hat materials, but, he added, "he now comes here, and will vigorously contest that they are." In one of the newspapers containing this interview this treasury agent is represented as declaring: "I am only too glad to give my views, as I think that the people should know all the facts in this attempt to loot the United States treasury." There has been no sort of denial of either the genuineness or the accuracy of these published interviews.

It is idle to say that there is no direct evidence to show that the jury read these articles. They appeared in the daily issues of leading journals, and were scattered broadcast over the community. The jury separated at the close of each session of the court, and it is incredible that, going out into the community, they did not see and read these newspaper publications. That these published statements were well calculated to prejudice the jury against the plaintiffs and deprive them of a fair trial is a proposition so plain that it would be a sheer waste of time to discuss it. Good ground, therefore, here appears for setting aside the verdict.

But it is strenuously urged on behalf of the government that counsel for plaintiffs "waived all right to object to a verdict on account of these articles, because they did not openly call the attention of the court to the same, enter their objection to further proceeding with the trial, and except to an adverse ruling on the application." The fact, however, is that, immediately after the earliest of the newspaper articles appeared, the plaintiffs' counsel did make an application at chambers to the judge presiding at the trial for the withdrawal of a juror, and the continuance of the case until the next term, on the ground that a fair trial had become impossible by reason of said publications. This application was resisted by counsel for the government, and, for reasons which then seemed satisfactory to the judge, was refused. What more, then, was incumbent upon the plaintiffs? It is true that the articles which they brought to the attention of the judge were less objectionable than those which subsequently appeared, and to which particular reference has been made in this opinion. But we think the plaintiffs' counsel had done their whole duty in the premises, and were under no obligation to renew their application to stop the trial. Under all the circumstances, a waiver cannot justly be imputed to the plaintiffs. For the reason we have discussed, the verdict must be set aside, and a new trial granted; and it is so ordered.

BUTLER, District Judge, who, at the request of Judge ACHESON, sat with him at the hearing of the motion for a new trial, concurs in the opinion and order.