UNITED STATES v. OGDEN.

(District Court, E. D. Pennsylvania. December 15, 1900.)

Nos. 25, 37.

1. CRIMINAL LAW—MOTIONS FOR NEW TRIAL—TESTIMONY OF JURORS.

On a motion for a new trial on the ground that jurors were prejudiced by a newspaper article published during the trial, it is competent for jurors to testify as to the fact of their seeing or reading the article, but not as to its effect upon their minds.

2. SAME—GROUNDS FOR NEW TRIAL—PREJUDICE OF JURORS BY NEWSPAPER ARTICLE.

A defendant convicted in a criminal case is entitled to a new trial where it is shown that some of the jurors read an article published in a newspaper before the case was submitted to the jury, which declared the defendant guilty, and contained many prejudicial statements and charges against him which would not have been admissible in evidence, besides commenting upon his failure to testify in his own behalf.

On Motion for New Trial.

James B. Holland and Wm. M. Stewart, Jr., for the United States. Dimner Beeber, for defendant.

J. B. McPHERSON, District Judge. The testimony taken in support of this motion shows that, after the evidence and the arguments of counsel had been heard, and while the jury were awaiting the charge of the court, the following article from the North American, a newspaper published in the city of Philadelphia, was read by one of the jurors; that two other jurors read the displayed headlines, and that the article was to some extent spoken of in the jury room while the verdict was being considered:

"Oleo Dealer Ogden's Boasted Pull of No Avail. Long Protected Man on Trial in Federal Court.

"Prosecuted for Eleven Offenses by The North American and Butter Association After State Officials Fail.

"Protection for David S. Ogden, the Ridge avenue oleo dealer, is apparently a thing of the past. After long dodging the law, he was brought to trial yesterday in the United States district court. A prospect of jail looms up.

"At his store, 2417 Ridge avenue, Ogden used to sell oleomargarine by the ton. He relied upon the state authorities to protect him in his illegal business,

and frankly admitted that he stood high in favor. By this arrangement he prospered at the expense of the defrauded public until the North American last April began its crusade against the bogus butter swindlers and their official allies.

"When Farmer Joseph C. Sharpless, of Chester county, wrote to the dairy and food authorities directing attention to Ogden's oleo trade, Secretary of Agriculture John Hamilton sent a reply to the effect that the inspectors of the department, after an investigation, had been unable to find oleo in the store. Agents of the North American and the Pure Butter Protective Association had no trouble in finding it, however, and they promptly caused Ogden's arrest under the federal law for selling the stuff in packages not properly stamped. The show window of the Ridge avenue establishment was at that time heaped up with oleo, in the same manner it had been displayed there for months.

### "Ogden Skipped His Bail.

"Ogden was to have been tried in May, but he skipped his bail, fearing imprisonment. Some time later he surrendered himself, and his bail was increased from $1,000 to $2,500. Since then his case has been on the trial list.

"The protectors upon whom Ogden had counted to save him kept in the background when he was brought into the federal court yesterday. With the evidence prepared by Luther S. Kauffman, counsel for the North American and the Pure Butter Protective Association, United States District Attorney James B. Holland conducted the prosecution. It was Mr. Holland's first oleo case since assuming office, and he pressed it vigorously. Ogden was defended by ex-Superior Court Judge Dimner Beeber. A number of prominent oleo dealers were among the spectators at the trial.

"Ogden's defense threw a lime light upon the shortcomings of the state dairy and food authorities.

" 'Why, this man hasn't tried to deceive any one,' declared ex-Judge Beeber, in his address to the jury. 'The evidence has shown that Mr. Ogden has been selling oleo openly and above board. He came to the government, and paid his tax to sell oleo. If that's so, whom did he try to conceal it from? Why, nobody.'

### "State's Pretensions Shattered.

"Whatever pretended excuse the state authorities had for ignoring Ogden's case was shattered by yesterday's proceedings. One of the state dairy and food commission's prosecuting attorneys was a spectator at the trial, and heard several witnesses swear that they had purchased oleo as butter at Ogden's store. With knowledge of such direct evidence of violation of the state law, the dairy and food commission can no longer delay a separate prosecution of Ogden, except in outright defiance of duty.

"As with all the oleo cases pushed to trial by the North American, the evidence against Ogden was strong and convincing. Five agents employed by this paper and the Pure Butter Protective Association testified to the purchases of oleo on eleven occasions ranging from March 6, 1899, to April 12, 1900. The first four times the oleo was bought in packages not stamped in any way. Twice it was secured in wrappers marked 'Butterine,' whereas the law requires the word 'Oleomargarine.' The other five times the wrappers were properly stamped, but the corner of the paper was folded in a flap over the printing, to conceal it, thus making a violation of the law.

"A description of Ogden's window filled with oleo was given by George Eldridge, the agent, who supervised all the purchases. He told how the golden yellow packages were arranged in three piles, bearing placards as follows: 'Gloverdale. Extra Fine. 20 Cents;' 'Farmers' Dairy. Gilt-Edge. 25 cents;' and 'Darlington Butter. Extra Fine. 20 cents.'

" 'Those names were enough to make the purchaser think he was right on the farm,' exclaimed District Attorney Holland.

### "Ogden Did Not Testify.

"Ogden did not venture on the stand in his own defense. One point of his attorney's contention was that Ogden was not the proprietor of the oleo

store, which was conducted under the name of the 'Ridge Avenue Beef Company.' To meet this, George Kirkland, employed by the North American, testified that Ogden had told him he owned the place. Chief Clerk Milligan, of the internal revenue office, said that Ogden had paid the United States tax in the name of the 'Ridge Avenue Beef Company. David S. Ogden, Manager.' It was plainly shown that the company name was only a cover.

"Another argument of Mr. Beeber was that there was no violation of the law in turning a corner of the wrapper in oleo to conceal the required stamp. District Attorney Holland thereupon read from the internal revenue regulations that packages of oleo must bear a brand 'so placed as to be plainly visible to the purchaser at the time of delivery to him.'

"Judge McPherson will deliver his charge to the jury this morning."

I need hardly say that the publishing of such comments during the course of the trial was a flagrant impropriety. If the printed words had been spoken to a juror, or if they had been contained in a letter addressed to him, an offense punishable by fine and imprisonment would have been committed; and it is little less blamable to take the not improbable chance of reaching the juror's mind by the method of publication in a widely-read journal. It is greatly to be deplored that a practice, of which we see too many examples, should exist, and that persons accused of crime should be put on trial in the columns of the newspapers, and should be declared to be guilty and denounced as criminals before there has been a careful and impartial trial in the proper and lawful tribunal. A report of facts is one thing, and due allowance should be made for the difficulties and inevitable disadvantages under which the reporter does what is often most excellent work; but after the facts have been ascertained as fully as possible, and laid before the public, it is manifestly unfair to the defendant to assume that no more evidence can be produced, or to draw hasty conclusions from such facts as are known without the safeguard of a public trial and a careful scrutiny of the evidence, and thereupon to declare the defendant guilty before a full and lawful investigation has been had. Moreover, such conduct is likely to make the administration of justice more difficult. Every one knows the frequent delay and trouble in obtaining an unbiased jury to try a case that has received this kind of treatment in the daily press, and the case in hand adds one more to the list of verdicts that the courts have felt obliged to set aside for the same reason. That a second trial of this defendant must be had is wholly due to the ill-timed zeal for conviction displayed by the article in question.

In the celebrated Hat Trimmings Case (C. C.) 49 Fed. 32, Judge Acheson set aside a verdict in favor of the government for a similar reason. There, articles not unlike in tone to the article now under consideration appeared in several newspapers of general circulation published in Philadelphia; and, although there was no proof that these newspapers had been read by the jurors, Judge Acheson declared it to be incredible that they had not been read, and upon this assumption decided without hesitation that an improper influence had thus been brought to bear to obtain a verdict. Here there is positive proof that the article was read, if the jurors were competent witnesses upon this subject. Objection to their testimony was

made by the government on the well-known ground that jurors are ordinarily not permitted to impeach their own verdict. But there is no doubt of their competency to testify to the mere fact of having read or seen the newspaper (Mattox v. U. S., 146 U. S. 149, 13 Sup. Ct. 50, 36 L. Ed. 917), although they could not be permitted to testify that the article had or had not influenced their minds. This is an inference which the court is to draw in each particular case, and it will be a more or less probable inference according to the character of the comments complained of.

The character of the comments now in controversy is so clearly prejudicial to the defendant that I need spend but little time upon that proposition. The article declares the defendant to have been a fugitive from justice, and to have long dodged the law. It asserts that he had combined with the state authorities to violate the state law concerning the sale of oleomargarine, and, in effect, accuses him of corrupt dealing with these authorities in order that he might secure protection in the carrying on of an illegal business. These charges may or may not be true. At all events, there was not a word of testimony about them at the trial, and no such testimony could have been received, even if it had been offered. The evidence that was produced was declared by the article to be strong and convincing; and, in defiance of the constitutional provision that no man shall be obliged to testify against himself, attention was called to that fact, and it was asserted that the defendant did not venture to testify in his own behalf,—an assertion which neither judge nor counsel would have been permitted to make during the course of the trial. It is unnecessary to say that such comments upon a pending case violate the elementary rules that demand justice and fair play to a man accused of crime. Under our system of jurisprudence, at least, cases are tried upon evidence that is carefully scrutinized, and not upon insinuation and hearsay; and it is an attack upon the prisoner's constitutional rights to influence the jurors by presenting to their minds charges against him of which no evidence has been offered, or by urging upon the jurors, or suggesting to them, that the defendant is guilty, and ought to be convicted.

I have no doubt that much of the newspaper comment that is open to the objections I have been endeavoring to state is made hastily, without due reflection, and certainly without desire to do the prisoner a wrong. This may be true in the present case. I have no reason to suppose that the article in question was written in a malicious spirit, but its tendency was manifestly to do the defendant harm, and I must deal with it from that point of view. I sincerely hope that the newspapers of this city, now that their attention has been recalled to this subject, will lend their powerful aid towards making trials impressive by a dignified abstention from hasty and ill-considered and sensational treatment of such vastly important subjects as the life or liberty of a citizen. Much may be permitted to the zeal of the press in detecting and exposing public wrongs. This is often very difficult work, and much freedom of

·expression is rightly allowed to those who are thus serving the public; but, after the preliminary stages have been passed, and the inquiry has come before a court of law, it does serious harm to the cause of justice to pursue the prisoner with invective, or to interfere with his trial by usurping the proper functions of the judge and the jury.

A new trial is granted in each case.