UNITED STATES v. GEORGA et al.

No. 11151.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1954.

Decided Feb. 3, 1954.

**46**

Joseph D. Ripp, Pittsburgh, Pa., for Appellant.

William B. Taffet, Philadelphia, Pa. (John W. McIlvaine, U. S. Atty., D. Malcolm Anderson, Jr., First Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a conviction under 18 U.S.C. § 371 for conspiracy to defraud the United States in the administration of its immigration laws. The defendant is a citizen of Greece, who came here on a temporary visa for the purpose of marrying a man in Connecticut. He was an honorably discharged soldier, and if the appellant had married him within three months, she would have been entitled to stay here. She did not marry this man but did subsequently marry a man named Manuel George. Later, she applied for a stay of deportation because of this marriage. It appears that Manuel George was the defendant's first cousin but it is disputed whether she knew this at the time she married him. Annulment proceedings were brought by Manuel George in Beaver County, Pennsylvania, and a decree of annulment was entered. Thereafter the United States prosecuted for conspiracy Manuel George, Marietoula Georga (this defendant) and a man named John Athanassion, who was the husband of the defendant's deceased sister. As to Athanassion, a verdict of not guilty was returned. The other two defendants were convicted but only Marietoula Georga appeals. There are two points on this appeal. The first has to do with claimed impropriety in argument by government counsel to the jury.

The government's case was conducted by two lawyers. The district counsel for the Immigration and Naturalization Service was there the first two days of the trial in the district court, and was on the brief and argued this appeal. His associate at the trial of the case in Pittsburgh took charge after the district counsel's departure. As part of his summation to the jury this associate went into a description of the quota system for immigration and pointed out that there was "a backlog of thousands, perhaps hundreds of thousands, perhaps millions of people from the far flung corners of the earth who want to come into this country and they can't * * *" At this point counsel for the appellant objected that the prosecutor was telling the jury things for which there was no proof. The court directed the jury to "ignore the remarks of counsel for the Government in respect to quotas from Greece * * * And anything else he might have said that was not in evidence you are directed to disregard." He overruled the motion for withdrawal of a juror.

Then comes the surprising part in view of what the judge had just said. Counsel, continuing, told the jury that when its members entered the jury box they did not leave behind their "intelligence and * * * experience and * * * accumulated fund of knowledge [and] * * * the experience and the wisdom that * * * [they had] accumulated over a period of years." Then he gave them a considerable amount of further information about the quota system, deportation and the like, and ended with the following: "But when she does not marry the veteran that she came in to marry, * * * and she is transferred from a nonquota status to a quota

status * * * the ten immigrants that could come in from Greece to this country—and this is only an example—is reduced by one, and only nine immigrants can come in from Greece for the current year, 1953."

In his very thorough charge the trial judge told the jury that the argument about this nine to one matter had been excepted to and he instructed the jury to disregard it. "I can't repeat his argument," the court said, "But you just disregard it. Don't even talk about it in the jury room."

The judge also talked to them about the application to suspend deportation. He pointed out that it was only an application and did not make the applicant a permanent resident of the United States or an American citizen. "If any of you have another idea about it, just eliminate it from your minds."

The trial judge quite evidently did all he could to keep the jury's mind on its problem. Why the counsel for the government volunteered all the talk about quota system is not shown on the record. Neither is it shown why he went back to it after objection had been made and the court told the jury to go on that and that only which was in evidence. But he did. And that which came after the interruption was, we think, more prejudicial than that which went before.

When remarks have been made in a trial which should not be made and the court carefully instructs the jury to disregard them, it is a question of judgment whether what was said was sufficiently misleading or prejudicial to call for reversal. It is not the kind of thing where the statement of a general rule or the citation of authorities can give very much aid.[1] We are clear in our own minds that this case is one which falls on the reversal side. The suggestion, that every time one person like the

defendant got from nonquota to quota status someone else was kept from coming, is not the kind of thing calculated to make a jury deal lightly with one being prosecuted for such a charge as this. And we think, too, that the jury was invited to substitute its own views and experience, and that of government counsel, for the evidence in the case.

In spite of the very clear admonition which the trial judge gave the jury we think that these remarks are not the kind that jurors could "put out of their minds" simply by being told to do so. There must, therefore, be a reversal.

The second question in the case is whether there is evidence from which a jury could rightfully conclude that the appellant was a party to a conspiracy. This was a hard case to try and must have been a hard one for jurors to understand. A large amount of the evidence came from admissions of the alleged conspirators. These statements were made to representatives of the Bureau of Immigration and Naturalization and also to the master in the Beaver County action by which the marriage of Manuel George and Marietoula Georga was annulled. The court charged the jury very carefully on the admissibility of this evidence. Indeed, it may well be that the court understood government counsel to concede more than was intended by counsel. At any rate, the court, after pointing out that after a conspiracy is proved the statements of any conspirator "are in legal effect the statements of all," went on to say: "In this case, however, the Government by its offers restricted those declarations or testimony of each defendant to him or her who uttered or made them. Therefore that testimony or those statements allegedly given by each defendant to the examiners or to the master in divorce in Beaver County annulment proceedings are not to be considered by you as evidence of the

---

[1] However, Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, is a case in point. There, a conspiracy conviction was reversed because, *inter alia*, the prosecuting attorney in his ar-

gument to the jury invited it to reach a conclusion not supported by the evidence but apparently within his personal knowledge.

guilt or innocence of the other defendants. Statements or testimony given by any defendant in this case are to be used only in determining the guilt or innocence of that person who made the statement or gave the testimony."

How a jury is expected to keep a whole series of statements separate in its collective head and apply damaging admissions to one and not to others is something never satisfactorily explained. That is one of the reasons why there has been so much criticism of what is thought by many lawyers to be too free a use of conspiracy charges.

■ We think, as did the district judge, that there is enough in this case to support a finding of guilty. To establish conspiracy this court has said many times that it is not necessary to show any formal agreement among the conspirators. Judge Leahy found the picturesque language to express the point when he quoted: "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." William Goldman Theatres, Inc., v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738, 743 note 15. The common plan can be and must often be established by what people do rather than by what they say. Telman v. United States, 10 Cir., 1933, 67 F.2d 716, certiorari denied, 1934, 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500; Rose v. United States, 9 Cir., 1945, 149 F.2d 755; Heald v. United States, 10 Cir., 175 F.2d 878, certiorari denied, 1949, 338 U.S. 859, 70 S.Ct. 101, 94 L.Ed. 526; United States v. Bucur, 7 Cir., 1952, 194 F.2d 297.

■ Marietoula Georga came to America on a temporary permit. She refused to marry the man she had come here to marry. She gave as a reason that her brother had died and her sister was very ill. And she also explained (this to an examiner in the Naturalization Service) that according to the custom of the Greek Orthodox religion a long mourning period was in order. Nevertheless, she did marry Manuel George within three months and, again, according to the testimony she gave the examiner, it was "because I received a letter that I either get married or return to Greece." She knew that Manuel George was a relative although she was unwilling to admit that she knew him to be a first cousin, which would bring the marriage into the prohibited degree of consanguinity in Pennsylvania. She went through with the marriage. She sought to escape deportation because married to a citizen. Then she was a party, and not a contesting party, to the annulment proceedings which took place soon thereafter.

Reading the entire transcript of the trial leaves one with considerable sympathy for the appellant. She is a Greek girl with no formal education whatever. She was brought to this country to marry this veteran. She knew no English and all the various examinations to which she was subjected in the Naturalization Service and in court had to be carried on through an interpreter. The admissions of co-defendants, especially Manuel George, while not evidence against appellant, under the court's instructions, show pretty clearly that this woman was being moved about as a matter of family convenience.

The trial judge quite evidently felt this same sympathy for her that we do. He put the defendant on probation, which is to be lifted in case she is deported to Greece.

The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.