UNITED STATES of America,
Appellee,

v.

Victor CARLUCCI, Joseph Giordano, Daniel Hanna, Joseph Merola, Norman Rothman, Stuart Sutor, Appellants.

Nos. 13136–13141, 13162.

United States Court of Appeals
Third Circuit.

Argued March 24, 1960.

Reargued En Banc, Nov. 17, 1960.

Decided March 2, 1961.

Hastie, Circuit Judge, Biggs, Chief Judge, and Kalodner, Circuit Judge, dissented.

See also 179 F.Supp. 935.

Michael von Moschzisker, Philadelphia, Pa., Vincent M. Casey, Pittsburgh, Pa. (Margiotti & Casey, V. J. Rich, Pittsburgh, Pa., Max Lurie, Miami, Fla., on the brief) for appellants.

Hubert I. Teitelbaum, U. S. Atty., Daniel J. Snyder, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

Reargued November 17, 1960, before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE and FORMAN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

These appeals have been taken by six defendants who were tried and convicted together in the District Court for the Western District of Pennsylvania for substantive crimes and a conspiracy

involving the alleged receiving, possession, transportation and exportation of a quantity of firearms stolen from the Government of the United States. All of the appellants urge that the evidence presented by the Government failed to prove beyond a reasonable doubt that they were guilty of the conspiracy or of the substantive crimes. Our review of the evidence as to the appellants Carlucci, Merola, Rothman and Sutor convinces us that there was at the very least, substantial evidence to support the jury verdict. Regarding appellants Giordano and Hanna, a detailed account of their connection with the conspiracy is necessary. We note at the outset, the fundamental proposition that in so doing, "The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." United States v. Giuliano, 3 Cir., 1959, 263 F.2d 582, 584.

When the illegal shipment of the guns was seized by the federal agents, the guns were wrapped in used burlap bags that were turnd inside out. To connect these burlap bags with Giordano and thereby tie him into the conspiracy, the government offered the following affirmative proof: that sometime prior to the seizure of the guns, Palumbo, an employee of another of the defendants, Carlucci, had purchased 100 used bags turned inside out for the appellant Giordano from the Arnold Cash Feed Store; that the Arnold Cash Feed Store only sold used bags in this form; that this was an unusually large purchase; that the bags which were wrapped around the guns were used burlap bags turned inside out; that upon F.B.I. laboratory analysis, the residual content of the bags wrapped around the guns was found to be a scratch feed composed of wheat, oats and cracked corn; that this was the same type of grain found at the Arnold Cash Feed Store, under the seat of the plane, and in the bed of the panel truck used to transport the guns to the plane.

Giordano was the only defendant to testify. He stated that he knew the defendants Carlucci and Hanna for approximately fifteen years. He admitted sending Palumbo to purchase the bags for him, but denied talking to Carlucci on that day. He said that the bags were to be used as a protection for newly planted grass on his lawns. He testified that Palumbo put the 100 bags in the back of his car which he drove home that evening. When he went to look for the bags the next day, he discovered that his daughter had taken the car with the bags in it to Robert Morris School in Pittsburgh. Upon her return a few days later, he placed them in his cellar and subsequently used some of them on his lawn. He further testified that because of this incident, he had purchased 30 other bags from the store in the interim.

In rebuttal, the government produced the testimony of an F.B.I. agent who had gone to Giordano's home to question him ten days after the seizure of the guns. The agent said that at this interview, Giordano stated that on the day he requested Palumbo to purchase the bags, he had spoken with Carlucci. Giordano also told the agent that his daughter had taken the bags to Seton Hill College in Greensburg and not Robert Morris School as his direct testimony had indicated. Upon inspection of the premises the agent discovered 148 bags: 99 in Giordano's cellar, 40 on the front lawn, 6 under the rear porch, and 3 in the trunk of his car. In addition to the numerical discrepancy between the number of bags Giordano admitted purchasing from the Arnold Cash Feed Store (130 bags), and the number found on his premises (148 bags), a close examination of the 99 bags in his cellar showed that they were *new bags turned right side out.*

Close examination of the evidence concerning Giordano's participation in the conspiracy, leaves no doubt that it was sufficient to take that question to the jury and to justify that body in concluding that the bags admittedly purchased by Giordano were the ones wrapped around the illegal shipment of guns. Such a finding connects Giordano with the conspiracy and makes him a party

thereto. Cf. United States v. Cohen, 3 Cir., 1952, 197 F.2d 26, 29.

In his brief appellant Giordano argues that even if the jury did so find,

"There is no suggestion that Giordano did anything else or had any knowledge of what anybody else did or agreed to do. There is not any indication that he had a stake in the venture within the meaning of United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204 [85 L.Ed. 128]. He is entitled to the protection of the Falcone rule and the rule that one does not become a party to a conspiracy by aiding and abetting it unless one knows of the conspiracy. Direct Sales Company v. United States, 319 U.S. 703, 709, 63 S.Ct. 1265 [87 L.Ed. 1674]."

■ In United States v. Giuliano, 3 Cir., 1959, 263 F.2d 582, 584–585, we precisely outlined the scope of the Falcone doctrine as follows:

"As the Supreme Court said in Direct Sales Co. v. United States, 1943, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674, the Falcone case stands for the proposition 'that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally.' The gist of the rationale for the case of United States v. Falcone may be found at pages 210–211, of 311 U.S. at page 207 of 61 S.Ct.: 'Those having no *knowledge of the conspiracy*

are not conspirators, * * * and one who *without more* furnishes supplies to an illicit distiller is not guilty of a conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge.' (Emphasis supplied). Cf. Direct Sales Co. v. United States, supra."

■ As is readily seen the principle is not applicable here. Giordano makes no assertion that he is an innocent dealer or supplier of goods to the conspirators. Nor does anything appear in the evidence that could support that sort of surmise. Moreover, there was other proof in addition to that identifying the bags wrapped around the guns as those bought by Giordano. The jury had before it, the long term association between Giordano and the defendants Carlucci and Hanna, that when Giordano purchased the bags he was at Carlucci's place of business, that he spoke with Carlucci at that time, and that he sent one of Carlucci's employees to purchase the bags for him. This collocation of circumstances provides an adequate basis upon which the jury could logically conclude that Giordano did have knowledge of the conspiracy and was an integral part of it. United States v. Giuliano, supra; United States v. Monticello, 3 Cir., 1959, 264 F.2d 47.[1]

■ Two main arguments are urged on behalf of the appellant Hanna. First, it is contended that even though there was clear evidence identifying Hanna as the driver of the truck whose cargo had been transferred to the plane which was subsequently seized with the illegal shipment of guns, there was no proof that

[1] The fact that this evidence is circumstantial, does not prevent the affirmance of the jury verdict. United States v. Georga, 3 Cir., 1954, 210 F.2d 45; United States v. Migliorino, 3 Cir., 1956, 238 F.2d 7, 9; United States v. Amedeo, 3 Cir., 1960, 277 F.2d 375, 377. As aptly stated in United States v. Georga, supra, 210 F.2d at page 48:
"To establish conspiracy this court has said many times that it is not necessary to show any formal agreement among the conspirators. Judge Leahy found the picturesque language to express the point when he quoted: 'The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age.' William Goldman Theatres, Inc. v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738, 743 note 15."

the truck's cargo was the illegal shipment of guns. Factually, appellant's position is that the guns could have been placed on the plane at some other place between Remick Field, near Pittsburgh, Pennsylvania, and the Morgantown Airport, in West Virginia. The government proof discounts this theory. It shows that the plane took off empty from the Allegheny County Airport, Pittsburgh, about 9:00 A.M. on the particular day. It arrived at Remick Field at 9:30 A.M. A telephone call was then placed from the field to Carlucci's home, and approximately 15 minutes later, Hanna arrived with the truck. The cargo from the truck was transferred to the plane, the process taking approximately one hour. The plane left at 11:00 A.M. and landed an hour later at the Morgantown Airport where it was seized. The distance between Remick Field and the Morgantown Airport was 67 miles. The weight of the seized cargo of guns was 1200 pounds.

These events and their chronology, while not spelling it out completely, did furnish enough justification for the jury's deduction that the items transferred to the plane from the truck driven by Hanna were the guns subsequently seized.

Next, appellant asserts:

"* * * even if guns were being loaded into the plane on November 4 to the knowledge of Hanna there is no evidence to show that he was anything more than a chauffeur * * *."

In essence, this is the same theory urged on behalf of Giordano, i. e., lack of knowledge of the conspiracy. Again it is defeated by the trial evidence and legitimate inferences therefrom. That evidence pointed to Hanna as the driver of the truck. More important with relation to Hanna's assertion of lack of knowledge is the testimony that when the plane arrived at Remick Field a call was made from the airport to Carlucci's home and a short time thereafter, Hanna arrived driving the truck loaded with the illegal shipment of guns. Coupled with this is the story of prior association between Hanna and three other conspirators, Carlucci, Merola and Sutor. Specifically, that one week before, a similar flight was made from the same airport under the same circumstances. That plane's cargo or destination was not established but Hanna, Carlucci, Sutor and Merola were positively identified as being there at that time.

Hanna's acts in sum total are contradictory of the defense that he had no knowledge of the conspiracy. As with Giordano we are forced to hold that the trial judge had no recourse but to let the question go to the jury. The latter by its verdict decided that Hanna did have knowledge of the conspiracy and was part of it. The evidence is sufficient to support those implied findings and they must be affirmed. United States v. Giuliano, supra; United States v. Monticello, supra.

The only other important problem in this appeal concerns the alleged exposure of the jury to articles prejudicial to the defendants which appeared in Pittsburgh newspapers during the trial.[2] On defense counsel calling the court's attention to these, the latter immediately inquired whether any of the jury had read them. A number of jurors indicated they had. As they were being checked, one of them said: "I would like to qualify my answer, that in reading the newspaper I have noticed the headlines, just noticed them and then just simply paid no further attention, other than those things you just scan quickly as you look at it. I didn't look at it to remember it." Another stated. "I just glanced at the headlines, I never studied it." Several jurors commented "I just glanced at it. Just the headline." The court meticulously questioned every remaining juror. These all replied that they had not read the ac-

counts. For a page and a half of the printed record the judge followed this up by patiently and carefully reminding the jury of his long talk to them as members of the venire and prior to their selection to serve in this case.[3] He repeated his fundamental thesis that a defendant is presumed innocent " * * * unless and until all the evidence and from all the evidence in the case a jury believes to the contrary beyond a reasonable doubt." Finally he said to them:

"Now I am going to ask this question of all of you: From your glances or perusal of any of the headlines or of any other matter contained in any newspaper or anything you might have heard on a television broadcast or radio broadcast, is there anyone here who has any doubt in his mind or her mind but that he or she could try this case and base his or her verdict entirely upon the evidence brought into court and admitted here and uninfluenced by any outside communication of any kind whatsoever? Now don't be afraid to say so.

"If you have any qualms about it, if there is anything you have heard outside the courtroom concerning any person connected with this trial which you have reason to believe would make it difficult for you to give any of the defendants in this case a fair trial, please don't hesitate to say so."

None of the jurors indicated having heard or seen anything outside the court room regarding any person connected with the trial which had created doubt of his or her ability to try the defendants

fairly. The judge expressed himself as satisfied and proceeded with the trial.

The situation before us is not that which confronted the court in Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, where members of the jury had read the newspaper articles and the query was as to the effect upon them of exposure to their content. In this appeal none of the jury had read any of the articles and there was no question of possible resultant harm. So the narrow issue for our consideration is not whether the district judge abused his discretion in gauging the consequence upon the jurors of newspaper accounts read by them but whether the judge was wrong in law by believing all twelve jurors when they told him that the most they had done was glance at the headlines. It has been argued that the jurors said this in order to avoid criticism by the court. That is a completely unwarranted assumption. A vigilant, experienced judge was in charge. His every word and every move established his determination to see to it that the trial was conducted with full justice to both sides. The court's early address to the panel, his attitude throughout this long trial which, with some interruptions, extended from January 11, 1960 to February 4, 1960, was one of highest sympathetic consideration for the jury. His above quoted language demonstrates that he was no bullier of citizens striving to do their sworn duty but perhaps caught in a hardly comprehensible problem not intentionally of their making. He courteously urged them to tell him if any one had read the stories and his "Now please don't be afraid to say so"

---

3. He had then explained to them the necessity of being careful about newspaper accounts, radio broadcasts or television pictures regarding the case; how "Neither judge nor jury must have any thought in mind other than that this defendant at this time must be presumed to be innocent and that he cannot be adjudged guilty unless and until the evidence in the case convinces the jury beyond a reasonable doubt." He, at that time, appealed to any panel member who had been so affected by the publicity that he or she could not be a fair juror to tell him. He stressed " * * * the sacred importance * * * of following these simple rules, which are the most important rules we have, that every individual accused of an offense is innocent unless and until the evidence introduced in this case convinces that person, that jury, to the contrary beyond a reasonable doubt."

and "please don't hesitate to say so" were statements honestly made which must be honestly interpreted. Thus interpreted they meant that any such juror would be excused without the slightest unfavorable remark. Even the most biased argument would be hard put to suggest that all twelve jurors, sworn to try the indictments fairly would deliberately break their oaths by remaining in the box, having read the items, instead of bowing out under the wise protection of the court and saving not only their dignity but their honor.

■ From the whole record we are confident of the jurors' probity. However, for the purposes of this appeal we need not go that far. There was most substantial evidence in support of the court's conclusion that the jurors had not read the news accounts. Suggestion to the contrary is at most suspicion founded on a worm's eye view of jurors generally. The judge was justified in believing the members of the jury. And believing them he had no recourse but to deny the motion for mistrial, the sole excuse for which was the theory that a member or members of the jury had read the trial accounts and therefore had been exposed to improper and prejudicial information respecting the defendants.

No decision has been furnished us or have we found any which is in conflict with our above conclusion. Marshall v. United States, supra [360 U.S. 310, 79 S.Ct. 1173], lends no help to the appellants' view. It lays down as its guiding principle where jury prejudice is alleged to exist that "each (case) must turn on its own special facts." Here the objected to accounts never reached the jury. The headlines which are all the jury saw contained nothing relative to the trial that was not in evidence. In Marshall there was admittedly juror exposure to the contents of the articles. According to the Court of Appeals opinion, 10 Cir., 1958, 258 F.2d 94, 97, "Six of the jurors read one of the articles and two of the six had read both." The Supreme Court opinion is founded on the reading by the jurors of news articles concerning the trial. It

says at page 312 of 360 U.S., at page 1173 of 79 S.Ct.:

"The trial judge has a large discretion in ruling on the issue of prejudice resulting from the *reading by jurors of news articles concerning the trial.* * * * Generalizations beyond that statement are not profitable, because each case must turn on its special facts." (Emphasis supplied).

We never reach the Marshall doctrine of whether the large discretion of a trial judge was rightly exercised on the issue of prejudice resulting from the reading by jurors of news articles of the trial. The court found that the news articles in this instance had not been read by the jurors. Therefore there was no exposure to their views and no possible prejudice to the jury.

In Griffin v. United States, 3 Cir., 1924, 295 F. 437, there was, as in Marshall, the acceptance of exposure by the jury to prejudice. The opinion itself states at page 439, "Members of the jury had been seen reading newspapers". Meyer v. Cadwalader, C.C.1891, 49 F. 32, 36, cited in Griffin, significantly makes no statement in the opinion that cautionary instructions were ever given the jury. The opinion does say "The jury separated at the close of each session of the court, and it is incredible that, going out into the community, they did not see and read these newspaper publications." To literally follow the reasoning of the opinion would mean sequestering all juries where there was a possibility of that sort of publicity otherwise mere appearance of an article held to be prejudicial regarding the trial, would be sufficient ground for granting a motion for mistrial. This is not the doctrine of the Supreme Court in Marshall. In McKibben v. Philadelphia & R. Ry. Co., 3 Cir., 1918, 251 F. 577, the complained of newspaper was indisputably brought into the jury room by a juror and read to all of the other jury members. Vaughan v. Magee, 3 Cir., 1914, 218 F. 630, is merely another example of a jury having been actually exposed to a statement which was not

in evidence. The opinion, at page 632, reads: "It suffices to say the jury * * * had before it substantial statements of matters which were not only not in evidence, but which on no principle of law could have been admitted into evidence." United States v. Ogden, D.C.E. D.Pa.1900, 105 F. 371, another decision urged by appellants, contains positive proof by the jurors that they had read and discussed the offensive report.

We have examined appellants' other points. They are without merit and do not warrant discussion.

The judgment of the district court will be affirmed.

HASTIE, Circuit Judge (dissenting).

I think the defendant Giordano should have been acquitted and that this court should now require his acquittal. He was convicted on counts five and seven of the indictment. In my view there was insufficient evidence to prove beyond reasonable doubt his guilt on either count. Count five is a substantive charge of unlawful failure to register certain firearms with the Secretary of the Treasury. I find no evidence whatever that Giordano had any such connection with the possession or transportation of the firearms here in question as to make it his duty to register them. Indeed, the opinion of this court does not discuss this count but rather supports Giordano's conviction of conspiracy under count seven.

The entire proof thought to support the conspiracy charge against Giordano consists of evidence that he purchased some burlap bags; that a friend who worked for Carlucci made the purchase for him; that later these bags, no longer in the possession of Giordano, were used as wrappings for a shipment of contraband firearms; and that his explanation of the purchase to an investigator shortly after the event differed in some particulars from the account he gave later on the witness stand. It was not proved that Giordano ever knew or intended that the bags were to be used to wrap guns. Beyond that, the prosecution did not even attempt to show that he knew the guns were stolen, unregistered or untaxed, or that there was to be an interstate or foreign shipment of contraband. Yet, only if he was aware of the gun-running scheme and some illegal aspect of it, could he be properly convicted as a member of the conspiracy to commit particular offenses as charged. For, as Judge Learned Hand has reminded us: "While one may * * * be guilty of running past a traffic light of whose existence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past." United States v. Crimmins, 2 Cir., 1941, 123 F.2d 271, 273. I think Giordano has been convicted of conspiring to commit various substantive crimes with no evidence whatever of his awareness that these crimes were contemplated, much less, that his activity in connection with a quantity of burlap bags would facilitate these crimes.

The worst that can properly be found in this regard is that Giordano's conflicting statements about the bags show apprehension or even belief that the bags had become involved in some wrongdoing. But that is far short of demonstrating that he acquired or disposed of them intending that they be used in any of the crimes charged in this indictment. In my view this conviction must have been based upon speculation by the jury about the connection of Giordano with the conspiracy charged. Therefore, it should not stand.

The case of the defendant Hanna is different. He was the truck driver who transported the stolen goods to the airport. He is charged in several counts. In count three he is charged with the substantive offense of possession of property of the United States knowing it to have been stolen. Cf. Rayborn v. United States, 6 Cir., 1956, 234 F.2d 368. Unquestionably he did for a time have a truck load of stolen guns in his possession. He never offered any exculpatory explanation of this. Accordingly, a jury could properly infer guilty knowledge from his unexplained possession of the

stolen articles. Cf. United States v. Allegrucci, 3 Cir., 1958, 258 F.2d 70. For this reason I think Hanna is not entitled to acquittal as a matter of law.

Quite apart from questions as to the sufficiency of the evidence concerning the participation of particular individuals in the crimes charged, the appellants contend that the district court erred in its disposition of their request that a mistrial be declared because of the jury's exposure to information highly prejudicial to the appellants which was published in daily newspapers in Pittsburgh, Pennsylvania while this trial was in progress there.

The case was tried to a jury for more than three weeks. During this period the jury was not sequestered. Its members were entirely at large from the end of each trial day until the beginning of the next. During the first week of the trial derogatory articles about the defendants appeared, conspicuously placed and headlined, in local daily newspapers. The articles contained a substantial amount of material prejudicial to the defendants which was not and, in large part, could not have been put in evidence at the trial. As to this there is no dispute. The newspaper stories stated that all of the defendants were connected with a "gambling combine" in New Kensington, that one of them also operated a gambling concession in Havana, and that the purpose of their attempted exportation of guns was to protect gambling franchises in Cuba.

On June 21st, a few days after these derogatory articles were published, counsel brought the publications to the attention of the trial judge who thereupon questioned the assembled jurors about the matter in open court. The judge first asked the jury whether any of them had read newspaper accounts of the trial. Juror No. 8 replied, "I have". The court then asked: "Are you the only one that has?" At this point jurors No. 2, 3, 5, 6, 9, 10, 11, 12 and two alternates all raised their hands, signifying that they too had read newspaper accounts of the trial. This, of course, was in violation

of the instructions the court had given the jury. Then one of the jurors addressed the court as follows: "I would like to qualify my answer, that in reading the newspaper I have noticed the headlines, just noticed them and then just simply paid no further attention, other than those things you just scan quickly as you look at it. I didn't look at it to remember it". Thereupon each of the jurors who had admitted reading newspaper articles modified his admission to conform with what had just been said. One of them observed: "I can say about the same thing. I paid little attention to the accounts in the headlines, knowing it don't mean nothing to me, what is in the paper. I use my own judgment". Two jurors then said: "I am the same". Four others stated: "I have been doing the same".

The judge then emphasized to the jury the importance of deciding solely on the basis of the testimony in court. He also stressed the gross impropriety of newspaper, radio and television reports containing derogatory information about the defendants on trial. Having thus sought to minimize the risk of prejudice to the defendants the court denied the defendants' motion for a mistrial.

It is indisputable that when jurors are allowed to disperse from day to day during a long much publicized trial there is danger that they will be subjected to improper influences. When derogatory materials about the defendants are published in daily newspapers in communities where the jurors live the likelihood of prejudice to the defendants often becomes so great that corrective action is required. Griffin v. United States, 3 Cir., 1924, 295 F. 437. The problem is to decide when and whether a situation has developed in which a court should not risk any corrective less drastic than a new trial.

Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, is a significant new development of the law in this area. In that case, during a criminal trial some jurors had "read" and others had "scanned" articles preju-

dicial to the defendants. But, examined separately and apart from their fellow jurors, each of them assured the court that he had not been influenced by the articles in question and could put them out of mind in reaching a decision on the evidence. Before the Marshall decision various courts had held that this sort of assurance combined with impressive judicial admonition was enough to make unassailable a decision of the trial judge that the defendants had suffered no serious prejudice from adverse newspaper stories and that there was no sufficient reason for declaring a mistrial. E. g., United States v. Leviton, 2 Cir., 1951, 193 F.2d 848; United States v. Carruthers, 7 Cir., 1945, 152 F.2d 512. But in the Marshall case the Supreme Court, ignoring this older line, said that this kind of "exposure of jurors to information of a character * * * so prejudicial that it could not be directly offered as evidence" was in itself enough to require a new trial. 360 U.S. at page 312, 79 S.Ct. at page 1173. And see the foreshadowing concurrence of Mr. Justice Jackson and Mr. Justice Frankfurter in a somewhat similar, though clearer, situation in Shepherd v. State of Florida, 1951, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.

In the present case, if the jurors had adhered to their first admissions of reading newspaper accounts of the trial, the Marshall rule would unquestionably have required that a new trial be ordered. If this case is significantly different from Marshall, the difference must be found in the fact that the jurors so modified their original admissions as to indicate only a minimal contact with or observation of articles published about the trial. Two circumstances deserve special mention in this connection. The judge at no time examined individual jurors out of the presence of their colleagues. Each was in position to be influenced by what his colleagues had said about paying little attention to the articles. Second, even in the general questioning of the entire jury there was no inquiry, much less a searching cross-examination, to obtain

any explanation of the jurors' uniform modification of original admissions in order to adopt what a colleague had been heard to say about merely reading "headlines" and "those things you just scan quickly as you look at it". On its face this conduct gives the impression of an effort to escape or minimize possible criticism of their reading about the trial rather than a genuine recollection that admissions made only minutes earlier were mistaken. In these circumstances I think that the change of position by the jurors does not to any really significant extent diminish the great likelihood of prejudice disclosed when on first inquiry so many of them admitted that, contrary to the court's earlier admonition, they had read newspaper accounts of the trial. And because I read the Marshall case as meaning that very substantial risk of prejudice in all the circumstances, rather than clear affirmative demonstration of prejudice in fact, is enough to require a mistrial when jurors have been exposed to inadmissible and derogatory publications about a person on trial, I think the Marshall rule strongly supports the appellants' demand for a new trial here.

Finally, even in the absence of direct evidence that jurors have read the publications in question, early decisions in this circuit have taken the position that there is a strong logical inference that jurors permitted to separate during a trial have seen or learned of derogatory material about the defendants which has appeared conspicuously during the trial on the front page of a local daily paper. In Meyer v. Cadwalader, C.C.E.D.Pa. 1891, 49 F. 32, 36, Circuit Judge Acheson said:

"It is idle to say that there is no direct evidence to show that the jury read these articles. They appeared in the daily issues of leading journals, and were scattered broadcast over the community. The jury separated at the close of each session of the court, and it is incredible that, going out into the community, they did not see and read these newspaper publications."

In Griffin v. United States, 3 Cir., 1924, 295 F. 437, the only evidence that a single derogatory front page newspaper story about the defendant had come to the attention of the jury was testimony that one juror had been seen with a copy of that paper in his possession. The court held that a new trial should have been granted.

These uncompromising rulings of our predecessors in this circuit are old. The Supreme Court ruling in the Marshall case is very new. In sum they provide what to me are convincing reasons for directing a new trial in the circumstances of the present case.

The judgment should be reversed and the cause remanded for dismissal as to Giordano and new trials in the cases of the other appellants.

BIGGS, Chief Judge, and KALOD-NER, Circuit Judge, concur in the views expressed in this dissenting opinion.