UNITED STATES of America

v.

Abe **MARKOWITZ**, Anthony Farese, James Chieppa, Charles Veneziale, Henry Kush, Angelo Sgro, James Randazzo.

UNITED STATES of America

v.

Joseph **LA MACCHIA**.

Cr. Nos. 19766, 19788.

United States District Court
E. D. Pennsylvania.

Sept. 15, 1959.

Louis Lipschitz, Philadelphia, Pa., for Abe Markowitz.

William Austin Meehan, Philadelphia, Pa., for Charles Veneziale.

Donald J. Goldberg, Philadelphia, Pa., for Anthony Farese, James Chieppa, Henry Kush, Angelo Sgro, James Randazzo and Joseph LaMacchia.

CLARY, District Judge.

This matter is before the Court on motions for judgment of acquittal and/or a new trial filed by the above-named 8 defendants, who were indicted under the foregoing Bills of Indictment and tried before this Court and a jury commencing June 8, 1959. Of a total of 17 defendants who went to trial on the charge of conspiracy to violate the Internal Revenue Laws of the United States, in violation of the provisions of Title 18 U.S. C.A., Section 371, 8 defendants were granted motions for judgment of acquittal during the trial; one (1) defendant was acquitted by the jury; and the jury returned a verdict of guilty as to each of the above-named 8 remaining defendants.

A previous trial which commenced on March 16, 1959, before the Honorable Edwin D. Steel, Jr. and a jury, had resulted in a mistrial.

In capsule form the essential facts of the cases are as follows:

On Saturday, June 7, 1958, Agents of the Alcohol and Tobacco Tax Unit of the United States Treasury Department raided 2 buildings in Reading, Pennsylvania, in which was discovered an enormous illegal distillery in full operation. The testimony indicates that knowledge of the existence of the illegal still was first obtained by the Agents on June 5, 1958. The buildings were kept under surveillance for approximately 36 hours and the raid then ensued. Although three people were seen by the Agents entering the buildings and none emerged, no one was found on the premises.

To properly set the case in perspective, it must be understood that the buildings involved were part of an extensive group of buildings, some 16 in number, formerly occupied solely by the Penn Hardware Company and known as the Penn Hardware buildings. Of varying sizes, one, two and three stories, 15 of the buildings were used for manufacturing and shipping purposes, and the 16th building was a two-story office building. The David Realty Company purchased the entire property and attempted to make an industrial center by renting buildings and portions of the buildings to different industrial concerns. At the time of the incidents here involved, the following firms, among others, occupied an entire or portion of a building of the group:

1. American Chain and Cable Co.
2. Bechtle-Letts Co.
3. Midland Western Co.
4. Penn Electric Company
5. Hodges Bedding
6. Auto Parts
7. Schoener's Candy
8. Sears Roebuck Company
9. Ladds Hosiery Co.
10. East Penn Refractories
11. Bright Light Reflector
12. Keystone Engineering
13. Yale Electric
14. Berkey Construction
15. Reuben-Donnelly Corporation
16. International Foundry

These buildings were located on the outskirts of central city Reading and were bounded by Spruce Street, Canal Street and Water Street. Obviously old buildings, they were all served by cesspools and no sanitary sewer connections had ever been made to the buildings. Most of the buildings were situated on the perimeter of a large courtyard leading to Spruce Street, although there were other connections with other buildings through driveways to other streets. Three of the buildings, designated by numbers 7, 8 and 16, had been leased to the Penn Electric Company, one of the above-named tenants. Buildings 7 and 8 were located on the courtyard; building 7 immediately adjacent to the courtyard, a single-story building; building 8, a three-story type building, immediately to the rear. Building 16, a three-story factory type building, was located along Spruce Street. The entrance to the courtyard from Spruce Street separated building 16 and the office building.

Abe Markowitz, president and principal owner of the David Realty Company, was in charge of the operation. His relations with the Penn Electric Company were less than cordial. Penn Electric Company started to enclose an open garage in building 7 with the intention of putting in overhead doors. It also started to make a meterroom in building 16 for the installation of meters and other equipment necessary for the operation of the three buildings. However, around Christmas of 1956, a person known only in this case as Joe Brown, and as yet unidentified, approached Markowitz with an offer to rent, or buy, buildings 7 and 8. Markowitz consulted Harold Blumberg, a member of the firm of Yaffe and Blumberg, who was then and still is First Assistant District Attorney of Berks County, Pennsylvania, and the testimony is uncontradicted that Blumberg advised Markowitz against leasing, since Markowitz did not know anything about the background of the prospective lessor or purchaser, Joe Brown. Negotiations then ensued between Blumberg and Brown with the net result that an agreement of sale prepared by Blumberg was entered into between Markowitz, representing the David Realty Company, and Joe Brown. Penn Electric Company was then ordered to vacate. Settlement was set for January 10, 1957, and concluded in accordance with the terms of the purchase agreement.

Thereafter the purchasers proceeded to close up the open garage, brick up the windows of buildings 7 and 8 on the first floor, and proceeded with the construction of the meterroom in building 16, in accordance with the procedures theretofore started by Penn Electric Company. Incidentally, it may be remarked at this time that the construction of a meterroom for all the buildings to which its company employees and meter readers should have sole access had long been urged by Metropolitan Edison, the utility company which supplies the City of Reading with electricity. Completion of the meterroom in building 16 occurred before March 1, 1957.

Several months later when the cesspools failed to work, Markowitz arranged to have them cleaned out. As before stated, these cesspools served all of the property and not buildings 7 and 8 alone. Some time in the Fall of 1957, Markowitz was approached by Joe Brown, who offered to pay one-half of the cost of constructing a sanitary sewer along Spruce Street, which when constructed would be available for the entire operation. Markowitz made application to the City of Reading for permission to have one constructed; the necessary ordinances were passed; an independent engineering and construction firm was engaged, and a sewer was installed in the bed of Spruce Street, extending from Water Street to a point approximately at the entrance to the courtyard. In his purchase of the buildings Brown had also obtained title to a strip of land through the driveway and courtyard which gave him free access to the buildings 7 and 8. That the sewer was not extended past the driveway and to the office building was explained by the Government witnesses as due entirely to the topog-

raphy of the land along Spruce Street. No permit was ever asked by any one after the completion of the sewer in 1958 to connect with it. However, when the raid occurred on June 7th, and shortly thereafter, it was found that buildings 7 and 8 had been surreptitiously connected with the sewer by a lateral line extending under building 16, which building the testimony discloses was in a dilapidated condition with practically all of the windows in the building, a large structure, completely broken and knocked out. The evidence introduced would justify any jury in finding that this enormous still with a three-story column had been in operation from February or March of 1957 through June 7, 1958. However, there is an entire absence of any testimony that any one, despite the busy area in which these buildings were located, ever saw a piece of equipment taken into the building; ever saw any supplies requisite for the operation of the still enter the building, and never saw cans and other essentials of a still operation being brought in or out.

There were some 27 defendants indicted under the foregoing two-numbered indictments. Many pleaded guilty; others were granted severances, and some 17, including Markowitz, charged with conspiracy to violate the Internal Revenue Laws of the United States, went to trial. After a trial lasting over three weeks, 8 of the defendants: Farese, Veneziale, Chieppa, LaMacchia, Sgro, Randazzo, Markowitz and Kush were convicted of conspiring, in violation of Title 18 U.S.C.A. § 371 (1950), to violate the Internal Revenue Laws dealing with the operation of distilleries.[1] All defendants have now moved in the alternative for judgments of acquittal or new trials. The evidence against each defendant will be reviewed separately.

■■ In the posture of this case a conspiracy may be defined as an agreement between two or more persons to achieve an unlawful object. The essence of the crime is the *agreement* on the part of each party to effect the object involved. They must each intend the accomplishment of the object; and they must *agree* on this. The agreement, of course, need not be expressed; it may be tacitly understood, and may be inferred from the actions of the alleged conspirators. However, it is still necessary that an agreement be found to exist even though the proof of it may be circumstantial.

■ In a civil case a plaintiff need only prove his case by a "preponderance of the evidence". When a motion for a directed verdict or judgment n. o. v. is made the test applied by the Court is whether a reasonable juror could conclude from the evidence that the occurrence of the facts necessary to support plaintiff's recovery is more probable than their nonoccurrence. If the evidence is reasonably susceptible of conflicting inferences on this score the case must be left to the jury.

■ In a criminal case the Government must prove all essential elements of its case "beyond a reasonable doubt". This is a much more exacting test than proof that something is merely more probable than not. Thus, the standard for directing a verdict or entering judgment of acquittal would seem properly to be whether upon the evidence viewed most favorably to the prosecution a reasonable juror could fail to have a reasonable doubt about the guilt of the defendant. The fact that the evidence is susceptible to different inferences is not enough; it must be sufficiently strong to banish all reasonable doubt. See United States v. Matsinger, 3 Cir., 1951, 191 F.2d 1014, 1016; United States v. Link, 3 Cir., 1953, 202 F.2d 592, 594 note 3. See particularly United States v. Masiello, 2 Cir., 235 F.2d 279, 285–294 (Frank, J. concurring), certiorari denied Stickel v. United States, 1956, 352

---

1. Defendant Kush was also convicted on an additional count. However, in accordance with a prior related ruling by Judge Steel on March 12, 1959, Kush's motion in arrest of judgment on this count will be granted.

U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79. This is the test that must be applied in this case; and while it may be somewhat nebulous, it suggests that the Government's case must be fairly strong.

At the trial defendant Farese was identified by three witnesses. Their testimony established that he was seen working in and around buildings 7 and 8 from January 1957 until the Spring of that year. This evidence is clearly sufficient to connect Farese with the operations at the still site as of that period of time. He also assisted in cleaning the cesspools. The problem is whether the connection is too far removed in time from the discovery of the still. In this regard, the very fact that Joe Brown purchased the premises for distilling purposes may be reason enough to support the view that operations began soon thereafter. At any rate, a worker in an adjoining building detected a liquid with the odor of beer in the drains near buildings 7 and 8 as early as March 1957. Furthermore, there was evidence that large purchases of kerosene were made at a service station three miles outside of Reading from February 1957 until the discovery of the distillery. The truck used to transport the kerosene was found at the still site at the time of the raid by Government agents; and several of the operators of the truck were otherwise tied in with the work at buildings 7 and 8. From all this evidence the Court feels that the jury could justifiably conclude that the conspiracy was afoot at the time Farese was seen.

Defendant LaMacchia was seen cleaning the floor of building 8 some time in January 1957. He was also identified as one of those who, on several occasions around February 1957, picked up the kerosene truck after it had been filled at the service station. LaMacchia, as in the case of Farese, was thus linked with the still site as of early 1957, and his conviction must be sustained.

Chieppa drove the kerosene truck during a period ranging from the early summer to the end of 1957. He was also seen in the vicinity of the still in April 1958, at which time he had with him a tractor-trailer that was discovered in building 7 at the time of the raid. The evidence here is even more weighty than that against Farese or LaMacchia; and the verdict of the jury was eminently justified.

Veneziale was also identified as a driver of the kerosene truck from the early summer to the end of 1957. Other testimony placed him working in the courtyard as late as the Spring of 1958; and in building 8 in January 1957. Once again the evidence is such as to connect the defendant with the conspiracy.

The Government's case was strongest against Kush. Not only was he identified as a driver of the kerosene truck in 1958, but he was seen entering the still site the day preceding the raid.

The motions of Farese, LaMacchia, Chieppa, Veneziale and Kush for judgments of acquittal are accordingly denied. Since the Court is further of the opinion that the interests of justice would not be served by the grant of a new trial with respect to any of the above-named defendants, their alternative motions are also denied.

The situation with respect to defendant Sgro is somewhat different. Two witnesses identified him. One placed him in the area of the still site in early February 1957. The other, a postal clerk, testified that Sgro called at the Post Office for a registered letter addressed to Joe Brown in January 1957. The witness stated that Sgro identified himself as Joe Brown and signed a receipt for the letter. The descriptions of Sgro which each witness had given Government agents prior to actually identifying him varied significantly from his appearance in Court. Furthermore, the defense offered the testimony of a handwriting expert that Sgro could not have signed the receipt. Before doing so the defense offered to have Sgro submit to the examination of a Government handwriting expert and to be bound by the results of his analysis. This offer was rejected and no Government expert was called, although one

was in Court. The Court feels that the testimony of defendant's expert was entirely credible; and that injustice would result from permitting the conviction to stand. A new trial will therefore be granted to Sgro.

Defendant Randazzo's motion for judgment of acquittal will be granted. Two witnesses identified Randazzo as having been seen working in the courtyard in the early part of 1957. The fact that he was seen cleaning the yard does not afford an adequate basis for the inference that he was a member of the conspiracy. Numerous other businesses abutted the courtyard, and it would be at least equally reasonable to connect him with any of them. In the absence of some further nexus the inference that his work was related to the still operation is mere speculation. Indeed, one of the Government's witnesses placed Randazzo in the courtyard while buildings 7 and 8 were occupied by the tenants who preceded Joe Brown. To allow a conviction on evidence such as this would jeopardize the liberty of any one unfortunate enough to be seen in an area where illegal activity is discovered.

▆ Remaining for consideration is the conviction of Markowitz, by far the most difficult aspect of the case. Markowitz, as president and sole owner of the David Realty Company, sold buildings 7 and 8 to Joe Brown in January 1957. The sale itself, however, plays no part in the case. This is necessarily so because of an entire lack of proof on the issue of Markowitz' knowledge at the time of sale of the proposed illegal use to which the buildings were to be put. Without belaboring the point, there was no evidence presented tending to confirm such knowledge. The Government argues that since evidence relating to matters occurring after the sale showed he had a part in the plan, his knowledge at the time of sale may be inferred. No direct evidence of any facts which would show knowledge of the presence of the still by Markowitz was introduced. Suspicions—yes; knowledge—no. Therefore, the conviction must rest upon circumstantial proof—apart from the sale—from which a reasonable juror could conclude beyond a reasonable doubt that Markowitz had knowledge of the illegal operation and thereafter did something with the intent of furthering the enterprise. Having determined this, a jury would be justified in taking the further step of inferring an agreement between Markowitz and others to achieve the unlawful object. Was such evidence introduced?

The initial problem is finding knowledge on the part of Markowitz of the existence of the distillery. Without knowledge the case must fall; for one cannot agree to that of which he is unaware. The evidence on this point, while somewhat tenuous, appears sufficient to permit the inference of knowledge. There was testimony that an alcoholic odor emanated from the still site; and one of the witnesses mentioned to Markowitz the possibility that the premises were being used to house a still. Moreover, Markowitz admitted to a Government agent that shortly after the sale he began to suspect that everything was not "according to Hoyle".

Positing knowledge, the next question concerns proof of the commission of some act with the requisite intent of furthering the enterprise. The Government relies on numerous incidents to supply this ingredient. Among these are the acceptance of mortgage payments from Joe Brown; the fact that Markowitz was seen in Brown's company; misstatements by Markowitz concerning the number of times he had seen Brown and the manner in which the mortgage payments were delivered to Markowitz' office; the fact that defendant had the cesspools that serviced buildings 7 and 8 cleaned; his ownership of building 16 which was situated beside the still site and the construction of the meterroom referred to together with Markowitz' presence in building 8. It is manifest that the relationship between Markowitz and Brown was one that would normally follow a sale of buildings. Furthermore, while Markowitz

may have been inaccurate or untruthful, this cannot substitute for proof of his complicity in the conspiracy. Again, the cesspools referred to serviced other buildings in the courtyard as well as 7 and 8, and it is undisputed that difficulties had been encountered in their operation. Ownership of building 16 is thought significant by the Government since "this building, for all intents and purposes, was * * * a part of the still site." The only comment necessary is that the basis for this assertion must be somewhere other than in the record of the trial, for it certainly is not there. The record also fails to substantiate the Government's contention that defendant was seen in building 8; for no witness so testified.

The only remaining factor the Government may rely upon to connect Markowitz with the conspiracy is the installation of the sewer line referred to along Spruce Street in the Fall of 1957 and the Spring of 1958. The Government argues that this was an aid to the conspirators in disposing of the waste material from the still. However, it clearly appears from the Government's evidence that this was an improvement needed by all of the buildings situated on the courtyard; and the contractor who performed the work even made reference to a conversation concerning such an installation that he had with a former owner of the David Realty Company. Moreover, the design and positioning of the sewer was undertaken by the contracting firm without instructions or suggestions from Markowitz or anyone else. The fairest comment that may be made about the incident is that it is no more susceptible of a guilty interpretation than an innocent one. Convictions should be based on sterner evidentiary material.

However, one additional fact was uncovered in relation to the sewerage system. It was discovered at the time of the raid that a disposal pipe had been illegally connected from buildings 7 and 8 to the trunk line of the sewer on Spruce Street. This pipe ran underground building 16 which was owned by Markowitz. Before any significance may be attributed to this fact, it would first have to be shown that Markowitz knew of the existence of the pipe. The only theory that would suggest such knowledge stems from his ownership of building 16. Since the pipe ran under this building, it might be argued that access to the building was necessary for the installation. From this it could be inferred that Markowitz permitted such access. It was impossible to run the pipe under building 16 without entering the building. However, the building was in a state of extreme disrepair, and ingress was easily accomplished. The pipe may well have been and was undoubtedly installed at night or over weekends when the other buildings in the area were vacant. Indeed, there was evidence presented by the Government indicating that operations were conducted at the still site at other than the normal working hours, and over weekends. In addition, the entire still was set up and operated for over a year, and yet no one apparently noticed any influx of machinery, equipment, or supplies, thus suggesting a well-concealed venture.

The possibilities are quite varied; and none is any more compelling than the others. The conclusion that Markowitz knew of this disposal pipe, while rationally permissible, is not one concerning which a reasonable person could fail to have a reasonable doubt. Since it is not, the conviction must fall and a judgment of acquittal will be entered. In light of this disposition, it need not be determined whether the other requisites in the Government's case could have been established had knowledge been proved.

Had the Court been in a position to review the evidence adequately at the trial, a directed verdict would have been entered at that time. However, as mentioned previously, the trial was a lengthy one, and the notes of testimony were not transcribed immediately. The Court,

therefore, felt that the wiser course to pursue was to permit the case to go to the jury.

Counsel for these defendants whose motions are being denied have raised several objections other than those discussed. Among these are certain objections to the charge of the Court. These, however, in addition to being without merit were not advanced at the trial.

 Reliance is also placed upon the recent case of Ingram v. United States, 1959, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503: There, defendants were convicted of conspiracy to evade the payment of taxes imposed on lottery operations. The court, in reversing the convictions of those who had other than a proprietary interest in the lottery, held that the Government must prove knowledge on the part of such defendants that the taxes in question were imposed and owing. The secretive nature of the operation was said to be insufficient for this purpose since the lottery was illegal under State law; and concealment might just as well have been dictated by a desire to avoid detection by the State authorities. Much the same situation obtains in the instant case, with one important difference. The Congress of the United States has within the past few years imposed a tax on gamblers and gambling operations. It is of recent origin as contrasted to this: the United States has regulated the distilling of whisky and alcohol since the Federal Government came into existence. This is a matter of common knowledge with an extensive history; a circumstance not equally true with respect to taxes on gamblers and gambling operations. Even during the prohibition era the Congress of the United States controlled the limited permissive distilling operations and exacted taxes for such operations. Under the circumstances of this case the jury was entitled to infer knowledge on the part of those convicted.

In conclusion and with particular respect to Markowitz, while as before stated there were many suspicious circumstances proved, there was no direct evidence of facts which would lead to the conclusion circumstantially that Markowitz had knowledge of the conspiracy or that he knowingly did any act with the intention of helping to effectuate the admittedly illegal venture.

An appropriate order will be entered in accordance with the conclusions above set forth.