UNITED STATES of America

v.

WARD BAKING COMPANY et al.

Crim. No. 21123.

United States District Court
E. D. Pennsylvania.

Nov. 15, 1963.

Donald G. Balthis, and John E. Sarbaugh, Anti-trust Div., U. S. Dept. of Justice, Philadelphia, Pa., for plaintiff.

Charles A. Wolfe, and Richard E. McDevitt, Philadelphia, Pa., for Ward Baking Co. and Oscar Doyle.

K. Robert Conrad, Philadelphia, Pa., for Fleischmann's Vienna Model Bakery and F. W. McCarthy.

Lloyd J. Schumacker, Philadelphia, Pa., for Frankford-Quaker Grocery Co. and Herman Heim.

H. Francis DeLone, Philadelphia, Pa., for Leo Rossi Baking Co. and Theresa Rossi.

William A. O'Donnell, Pottstown, for Schulz Baking Co. and Charles Schulz, Sr.

Benjamin M. Quigg, Jr., Philadelphia, Pa., for Stroehmann Brothers Co. and Leonard V. Thompson.

Henry T. Reath, Philadelphia, Pa., for Theo Staab.

**VAN DUSEN, District Judge.**

These post-trial motions were filed after a finding of guilty had been made as to the above defendants following a trial to the court on an indictment charging "the defendants, co-conspirators, and other persons to the grand jurors unknown entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the Philadelphia-Trenton area in an unreasonable restraint of the hereinbefore described interstate trade and commerce in economy bread in violation of" 15 U.S.C. § 1[1] (par. 11 of Indictment). Paragraph 12 of the Indictment provides:

"12. The aforesaid combination and conspiracy consisted of a continuing agreement and concert of action among the defendants, co-conspirators, and other persons to the grand jurors unknown to increase, fix, and maintain at all levels of distribution the price of economy bread sold in the Philadelphia-Trenton area."

Since the post-trial motions appear to overlook the applicable decisions binding on this court, a general review of such federal decisions will be given before referring to the pertinent evidence in this record.

**A.** *The Conspiracy*

"A criminal conspiracy is a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349." United States v. Perlstein, 126 F.2d 789, 794 (3rd Cir. 1942), cert. den. 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752. "The gist of the offense of conspiracy * * * is agreement[2] among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy," United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940), but "An express agreement is not necessary to prove con-

---

1. 15 U.S.C. § 1, provides:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, * * * is declared to be illegal: * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, * * *."

2. "[A]greement or confederation of minds," United States v. Anthony, 145 F.Supp. 323, 329 (M.D.Pa.1956).

spiracy." United States v. Frank, 290 F.2d 195, 196 (3rd Cir. 1961), cert. den. Toomer v. United States, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26.

### B. *Agreement*

■ "There must be an agreement of some character before there can be a conspiracy. This agreement need not be in writing. It need not be at a meeting attended by all of the alleged conspirators, but there must be express agreements or circumstances which would justify the court in reaching the conclusion that a combination had been formed." United States v. Griffith Amusement Co., 1 F.R. D. 229, 231 (W.D.Okl.1940). The agreement constituting a conspiracy "need not be expressed; it may be tacitly understood, and may be inferred from the actions of the alleged conspirators. However, it is still necessary that an agreement be found to exist even though the proof of it may be circumstantial." United States v. Markowitz, 176 F.Supp. 681, 684 (E.D.Pa.1959). Cf. United States v. Gilboy, 160 F.Supp. 442 (M.D. Pa.1958). "The appellant contends that the prosecution was premature and instituted before any crime had been committed, because the defendants had not reached any final determination upon a plan which would be a conspiracy within the meaning of the antitrust laws. * * * but the government need not wait until the conspirators have effectuated an actual restraint of trade before it takes action." Mercer v. United States, 61 F.2d 97, 99 (3rd Cir. 1932).

### C. *Knowledge of the agreement or plan*

■ "No formal agreement is necessary; a tacit understanding is sufficient and it is not essential that each conspirator have knowledge of the details of the conspiracy or the means to be used." United States v. Weinberg, 129 F.Supp. 514, 524 (M.D.Pa.1955), aff'd. 226 F.2d 161 (3rd Cir. 1955), cert. den. 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815. "It is not essential that each member of a con-

spiracy know and come in direct contact with all other members in relation to the conspiracy. Neither is it required that each participate in or have knowledge of all of the operations of the conspiracy. It suffices if a conspiracy is formed and the several persons knowingly contribute their efforts in furthering it." Berenbeim v. United States, 164 F.2d 679, 684 (10th Cir. 1947), cert. den. Schechter v. United States, 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113. "It is not essential that the precise person, time and place or precise methods be agreed upon." United States v. Gilboy, supra, 160 F.Supp. at p. 453.

### D. *Participation*

■■ " 'A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party, and with that knowledge commits some act in furtherance thereof. * * * This knowledge and participation may be inferred from the circumstances, acts and conduct of the parties.' " United States v. Kensil, 195 F.Supp. 115, 119 (E.D.Pa.1961), quoting Jones v. United States, 251 F.2d 288, 293 (10th Cir. 1958). "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.' " Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941), rehearing den. 315 U.S. 827,[3] 62 S.Ct. 629, 86 L.Ed. 1222.

### E. *Evidence of Conspiracy*

■ As noted above, "it is not necessary to show any formal agreement among the conspirators. * * * The common plan can be and must often be established by what people do rather than by what they say." United States v. Georga, 210 F.2d 45, 48 (3rd Cir. 1945). See, also, Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). "Criminal plottings are spawned in secrecy, and the very

---

3. Participation in a criminal conspiracy may be shown by circumstantial, as well as by direct evidence. Delli Paoli v.

United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); United States v. Monticello, 264 F.2d 47 (3rd Cir. 1959).

**70**

nature of conspiracy often precludes proof by direct evidence. For this reason it is an axiomatic principle of law that a conspiracy charge may be sustained on circumstantial evidence alone. * * * Overt acts done in apparent pursuance of a common plan serve as evidence to demonstrate the existence of a conspiracy." United States v. Migliorino, 238 F.2d 7, 9 (3rd Cir. 1956).

F. *Actions on the plan, responsibility*

 "If one has knowledge of the conspiracy and with that knowledge intentionally does some act or thing in furtherance thereof he may be held liable. * * * If so, he adopts as his own the past and future acts of all his conspirators." United States v. Gilboy, supra, 160 F.Supp. at page 454. "It is not necessary that all defendants come into it at one time or that they should all know each other, the complete and exact scope of the conspiracy or all of its ramifications * * *; that all contribute alike either to the making of the scheme or its fulfillment. It is enough if at some time during the continuance of the conspiracy there is a common design and purpose applicable to all." United States v. Gilboy, supra, 160 F.Supp. at page 453. "It is not necessary that all of the conspirators either meet together or agree simultaneously. * * * It is not necessary that each member of a conspiracy know the exact part which every other participant is playing; nor is it necessary in order to be bound by the acts of his associates that each member of a conspiracy shall know all the other participants therein; nor is it requisite that simultaneous action be had for those who come on later, and cooperate in the common effort to obtain the unlawful results, to become parties thereto and assume responsibility for all that has been done before." United States v. Empire Hat & Cap Mfg. Co., 47 F.Supp. 395, 400–401 (E.D.Pa.1952). See, also, United States v. Kensil, 195 F.Supp. 115 (E.D.Pa.1961), aff'd. 295 F.2d 489 (3rd Cir. 1961); United States v. Lester, 282 F.2d 750 (3rd Cir. 1960), cert. den.

364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368.

" 'It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.' " William Goldman Theatres v. Loew's Inc., 150 F.2d 738, 743 (3rd Cir. 1945), quoting from Interstate Circuit v. United States, 306 U.S. 208, 225, 59 S. Ct. 467, 83 L.Ed. 610 (1939).

 "Also, the fact that the person plays a lesser or even a minor part in a conspiracy and is not the dominant member of a conspiracy in no way lessens his guilt." United States v. Nedley, 153 F.Supp. 887, 892 (W.D.Pa.1957), reversed on other grounds, 255 F.2d 350 (3rd Cir. 1958). "The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. * * * Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1138–1139, 90 L.Ed. 1575 (1946).

In United States v. Migliorino, 238 F. 2d 7, 9 (3rd Cir. 1956), defendant was present during formation of the plan (a stolen car ring). There was no evidence of what he said at that meeting, but later there was an agreement that he was to share in the proceeds of the stolen cars. Defendant was arrested while helping another steal a car. The court said at page 9 of 238 F.2d:

"Inasmuch as this case contains direct evidence that Migliorino was present while the criminal scheme was being formed, it goes far beyond the minimum evidentiary requirements in conspiracy cases. Our position was made clear in United States v. Georga, supra:

* * * * * *

" 'The common plan can be and must

often be established by what people do rather than by what they say.' 210 F.2d at page 48."

I. Post-Trial Motions of Herman J. Heim and Frankford-Quaker Grocery Co. (Documents 102, 103, 122 & 123)

There is substantial evidence in the record to support a finding that representatives of the Schulz Baking Company (hereinafter called "Schulz") and representatives of defendant Frankford-Quaker, including its President Heim, were discussing in July 1960 the increase of the price of Frankford-Quaker's small Unity loaf which, on July 1, 1960, was selling at 17¢. While these discussions were going on, the representatives of Schulz were the most active members of a conspiracy formed in July 1960 with representatives of the Leo Rossi Baking Company and Fleischmann's Vienna Model Bakery, as well as Schulz's subsidiary, Twentieth Century Distributors, Inc., to raise the retail price of economy bread in the Philadelphia-Trenton area from 15¢ to 17¢. Before July 22, this conspiracy had advanced to the point where the conspirators had decided that New Century would be told to raise its price of economy bread to 17¢ or Rossi and Fleischmann's (its suppliers) would no longer supply it. Heim joined in the conspiracy on or after the meeting held on or about July 22, at which Heim placed the penciled notations on Exhibit G–19, as described in paragraph 12 of Exhibit

G–56.[4] On or about July 22, Heim agreed that the small Unity loaf would be raised in price to a new retail price of two for 37¢ on July 26, with the understanding that the economy loaves sold by New Century and Twentieth Century would be raised in price from 15¢ to 17¢ in the near future or on or about August 1 (N.T. 317–9, 934, 1236–40, 1601, 1689–1699, 1714–7, 1721, 1731, 1748, Exhibits G–56 (Exhibit A–1), G–16 and G–19),[5] since Heim considered that his company was in competition with the bread sold by Twentieth Century and New Century in selling its Unity bread (N.T. 1728, 1747–8, 1768; cf. 1713–4).[6]

Some of the specific testimony justifying the fact finder in making the above findings is paraphrased in this paragraph. Heim was informed by Mr. Allen at the July 22, 1960, meeting that the independents (Twentieth Century and New Century) were going up in price and that Allen had this from very good knowledge (N.T. 317–8). The competition affecting Frankford-Quaker's small Unity loaf was 60% from the chain stores and 40% from the independent distributors (Twentieth Century and New Century). See N.T. 317 and 1748. Allen informed Heim that he had had talks with Rossi and Fleischmann's[7] and gave sufficient information concerning these talks so that Heim would realize "that things were being straightened out" (N.T. 318). Allen and/or Mr. Jack

---

4. Heim knew of the prospective New Century price rise at least by the time of Frankford's increase in its price of the small Unity loaf on July 26 (N. T. 318, 1238).

5. One of the most persuasive items of evidence in support of the participation of Heim in the agreement to raise certain retail bread prices is the notation he made at the July 22 meeting on G–19, showing retail prices of 17¢ for Twentieth Century and New Century bread and two for 37¢ as the price for the Unity loaf. See, also, references to Notes of Testimony at paragraphs 28 and 29 on pages 11 and 12 of the Government's Memorandum (Document 134).

6. In order to meet the competition of the the 15¢ loaf sold by New Century and Twentieth Century, Frankford-Quaker, under Heim's instructions, introduced a 15¢ loaf of bread (Betsy Ann) into certain economically depressed areas of Philadelphia on July 28, 1960. N. T. 1693 and 1768. See Exhibit A to G–56.

7. At N. T. 299 and 1405, Allen testified that he went from Rossi to Fleischmann's for the purpose of discussing the price rise from 15¢ to 17¢. After a consideration of all the evidence, the trial judge was entitled to find that Allen had met with Fleischmann's at least once before the July 22 meeting with the representatives of Frankford-Quaker, including Heim (N. T. 324–5).

Schulz informed Heim on or about July 22 of the prospective price changes of Twentieth Century and New Century, including the proposed 17¢ retail price of the loaf then being sold at 15¢ retail (N. T. 319, 1236–40, 1601, 1689, 1699 and 1715–7).

In addition to the evidence referred to above, the following exhibits indicate the knowledge of prices which Heim secured through his subordinates in July 1960: G–15, 17, 46 and 47.

In the latter part of 1960, Heim discussed with Mr. Goldberg, a friend of his in York, that a York baker (J. S. Hershey Baking Company, hereinafter called "Hershey Company") was supplying New Century (a Philadelphia distributor) with bread, inquiring if such baker was "a legitimate operator" (N. T. 1682–3 and 1748), and Goldberg repeated the occurrence of this discussion to the President of this company, J. C. Hershey (N.T. 974–6 and 1684). Eventually, a meeting of Goldberg, Heim, Hershey and some other Hershey Company employees (Boileau and Kauffman) was arranged at the Cherry Hill Inn (near Philadelphia) on February 1, 1961. During this meeting, there was a discussion of the private label bread business in Philadelphia, during which Heim said that he had arranged a proposed price rise in the summer of 1960 pursuant to which Ward was to raise its price first, then Frankford-Quaker, then Schulz, and "that Fleischmann and Rossi would raise the price to (New) Century which would force them to go up at the same time" (N.T. 562–5).[8] Boileau also testified that Heim stated that Hershey Company "upset the apple cart" by supplying economy bread to New Century without

insisting that they put 17¢ end labels on such bread (N.T. 566). Hershey testified to the same statements by Heim (N. T. 784).

Heim is greatly respected by the directors of Frankford-Quaker and he has the authority to change the retail price of bread (N.T. 1724–5). No board approval was secured for introducing the Betsy Ann loaf at 15¢ into certain parts of Philadelphia on July 28, 1960. The fact that Heim decided to sell a 15¢ Betsy Ann loaf in limited sections of Philadelphia does not establish that he did not participate in the agreement to raise the price of his Unity loaf and of economy bread in all areas where such bread was being sold.

■ In view of the foregoing portions of the record, among others, the Motions for Judgment of Acquittal by defendants Heim and Frankford-Quaker Grocery Company must be denied.

The reasons for a new trial alleged in the above Motions have been carefully considered and found not to "require" such a trial "in the interest of justice." See F.R.Crim.P. 33. In view of the complete treatment of these reasons in the various Memoranda of authorities filed by the Government (for example, Document 134), only brief reference to a few of them is justified at this time.

Use of the Grand Jury Testimony
to Refresh Memory and as Past
Recollections Recorded

■ The authorities cited at pages 13–18 of the Government's MEMORANDUM IN OPPOSITION TO DEFENDANT'S POST TRIAL MOTIONS (Document 134) support the action taken by the trial judge in these matters. In

8. See, also, Exhibit G–50 at Entry of February 1. Mr. Boileau was a very careful, accurate and persuasive witness, whose diary made at or about the time of this February 1961 (N. T. 563) meeting refreshed his recollections. For example, Boileau testified, and the diary relates, that Heim said Hershey Baking Company "upset the apple cart" by supplying New Century in August 1960 and defendant's witness Goldberg testified that this was a usual expression for Heim, who (after Boileau's testimony) conceded that he used this expression but contended that he only used it in relation to a price rise agreement to which he and Frankford-Quaker were not parties. The trial judge was clearly entitled to find that Heim used this phrase at the Cherry Hill meeting (see, for example, N. T. 1661 and 1704).

addition to those authorities, the trial judge relied on Continental Baking Co. v. United States, 281 F.2d 137, 146–148 (6th Cir. 1960), and United States v. Consolidated Laundries Corporation, 291 F.2d 563, 574 (2nd Cir. 1961)

### Use of G–50 and Other Documents to Refresh Recollection

██ The decisions on this point are thoroughly collected at page 19 of Document 134.[9] The authorities have supported the use of a document prepared by A to refresh the recollection of B at least since the following, classic, 1810 statement on this subject by Lord Ellenborough in Henry v. Lee, 2 Chitty 124 (1810):

> "If upon looking at *any* document he can so far refresh his memory as to recollect a circumstance, it is sufficient; and it makes no difference that the memorandum is not written by himself, for it is not the memorandum that is the evidence but the recollection of the witness."

See III Wigmore on Evidence (3rd Ed.) §§ 758 and 759, pp. 100 ff. and language from Jewett v. United States, 15 F.2d 955, 956 (9th Cir. 1926), quoted by Government counsel at N.T. 384.

### The Questioning of Witnesses by the Trial Judge as Denying to the Defendants the Effective Assistance of Counsel

██ Shortly before the trial commenced, the United States Court of Appeals for the Third Circuit commented as follows on the right of the trial judge to question witnesses in a criminal case:

> "We have long abandoned the adversary system of litigation which regards opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed. See 3 Wigmore, Evidence (1940 Ed.), § 784. A trial is not a contest but a search for the truth so that justice

may properly be administered. For the purpose of eliciting the germane facts, a judge may on his own initiative and within his sound discretion interrogate witnesses. 3 Wigmore, supra; Annotation, 11 A.L.R. 1172 (1933); 53 Am.Jur., Trial, § 75. * * * In our federal system the trial judge has the duty to discover the truth, elicit material facts, clarify testimony, and expedite the trial as much as possible. United States v. Brandt, 196 F.2d 653 (2d Cir., 1952)."

Riley v. Goodman, 315 F.2d 232, 234 (3rd Cir. 1963). See, also, the authorities cited at pages 29–31 of the Government's Memorandum In Opposition To These Motions (Document 134), where it is pointed out at page 30 that the trial judge has wide latitude in asking leading questions. The undersigned has examined the pages of the transcript complained of in paragraphs 7 of Documents 122 and 123 and has concluded that the actions of the trial judge, as recorded on those pages, are not a proper basis for a new trial. See first sentence of F.R.Crim.P. 33.

### Deletion of Entries of 1/26/61, 1/30/61, 2/16/61 and 3/1/61 from G–50

██ The deletion of these diary entries primarily on the grounds of lack of relevancy is covered at N.T. 518–544. The contents of these diary entries, which are blocked out in G–50, may be determined by the appellate court through examining them as they have been reproduced on a sheet of paper enclosed in a sealed envelope docketed in the Clerk's file as Document 138. Authorities in support of the ruling by the court appear at pages 20–24 of Document 134.

### Rejection of Diary Entry of 2/10/61 When Offered at N.T. 1807 (par. 12 of Documents 122 and 123)

██ ██ This entry had been read into the record at N.T. 727, so that if there

---

9. The necessary background for Boileau's use of the diary to refresh his recollec-

tion on the statements made by Heim at Cherry Hill is found at N. T. 563.

were any error in rejecting the entry as it appeared in G–50, such error would be harmless. The record indicates that the court reserved ruling on this offer at N.T. 1814. It was counsel's responsibility to raise the point again at the close of all the evidence if no ruling was, in fact, made. If an appellate court treats the ruling as a rejection of the entry, the authorities at pages 24–26 of Document 134 support such rejection.[10]

II. Post-Trial Motions of Theo Staab, also known as Theodore Staab (Document 120)

■ After the July 1960 agreement to raise the price of economy and other bread had been made, the price rise of economy bread was cancelled due to New Century's refusing to raise its price after securing a new supplier in York (the Hershey Company). In an effort to have the Hershey Company either persuade New Century to raise its price or to stop supplying it with bread, Schulz started to sell bread at very cheap prices in York (Hershey Company's home market) in January 1961. In order to deal with Schulz's invasion into the York market with this cheap bread, defendant Staab arranged a meeting at the Penn Harris Hotel on February 14, 1961 (N.T. 838, 1268–9, 1890 and G–55). Prior to coming to this meeting, Staab advised Mr. Hershey (1) that Schulz would not get out of York until Hershey Company did something about Philadelphia, and (2) that Stroehmann and Holsum would give him until March 1 to get the Philadelphia market straightened out, showing that Staab was aware of the attempts to raise the price of bread in Philadelphia (N.T. 792–3).[11] At the February 14 meeting in the Penn Harris Hotel, several of those present testified that Staab participated in discussions of the desirability of getting New Century to raise its price of bread in Philadelphia and of Hershey Company's representatives' trying to accomplish this.[12] After the meet-

10. The other reasons for new trial raised by these defendants have been considered and rejected as not requiring comment in view of the authorities already in the Clerk's file (see, particularly, Document 134), as pointed out at page 12 above. (See, also, footnote 14 at page 17 below.)

11. It is not necessary to rely on Boileau's testimony or the entry of February 11, 1961, in G–50 for this evidence. See N. T. 871–3 and 877–8 for Boileau testimony on this point. This entry was not shown to Hershey until after his testimony at N. T. 792–3, but, on the basis of the authorities referred to above at pages 12 & 13, it was proper to permit Hershey to use this to refresh his recollection at N. T. 796, and his further testimony after looking at the entry appears at N. T. 797–8. The record amply supports the finding that Staab placed a telephone call to Hershey on February 11, as testified to by Mr. Hershey (N. T. 792–7) and placed another call to Mr. Hershey on February 13, both calls being before the February 14 meeting at Harrisburg. In spite of vigorous cross-examination by one of Philadelphia's leading attorneys, Hershey reaffirmed, at N. T. 841, that, even if Staab (his longtime friend; see N. T. 809 and 839) testified during the trial that he knew nothing of Dougherty (partner in New Century) until the Feb-

ruary 14 meeting, Staab told him on the phone on February 11 that Holsum and Stroehmann would give Hershey Company until March 1 to get the situation straightened out with Dougherty and Marchei (New Century partners). A fair reading of the last question and answer at N. T. 841, in the light of Hershey's lengthy cross-examination by Staab's attorney, makes clear that this answer was not a flat, affirmative answer to the question, as contended in Staab's brief (p. 5 of Document 143).

12. Allen testified that everything discussed at the York meeting was discussed again (N. T. 404), that there were discussions of raising of the price of the 10-inch loaf from 15¢ to 17¢ in the Philadelphia market, and that Schulz would withdraw from the York market if this was done, and that everyone present acceded to his plan (N. T. 412). At N. T. 414, Allen testified that Staab said the following:
"* * * he told Hershey that it would be well to get the Philadelphia market straightened out so that the York market wouldn't be involved in a bread war, so all bakers would end up losing quite a bit of money.
"BY MR. MELONE:
"Q Did he say anything further? Did he say anything to Hershey concerning the market in Philadelphia?

ing, the representatives of Hershey Company went to Philadelphia and informed New Century of "what was being asked of us" but "They didn't feel it was practical" (N.T. 588; cf. 1074). Staab concedes that after the February 14 meeting, Hershey called him and said "You might as well call Schulz and tell him it's no go. We saw Dougherty, and it's no go" (N.T. 1945). Allen testified that Staab also called him after February 14 and asked why Schulz was not keeping his word in the York market (N.T. 415).[13] This record contains substantial evidence that Staab acquiesced in a conspiracy to raise the price of economy bread in Philadelphia and made affirmative suggestions to implement such conspiracy.

For this reason, Staab's Motion for Judgment of Acquittal must be denied.

The reasons for a new trial alleged in the above Motion have been carefully considered and found not to "require" such a trial "in the interest of justice." See F.R.Crim.P. 33. In addition to the authorities cited[14] and discussion set forth above, it is only necessary to comment on these items:

Contention That Trial Judge Erred In Restricting Cross-Examination of Witness Fox (pp. 19–21 of Staab's Brief, being Document 143, and pp. 19–23 of Reply Brief, being Document 144)

■■ The trial judge believes that it would be almost impossible for a person,

in the spring of 1963, to testify with certainty that he did not receive a phone call in February 1961 (over two years previous to the time of the testimony). Therefore, the testimony of this witness was treated as if he might have forgotten that he received a call from Staab (which was the testimony of three other witnesses questioned on the subject—N.T. 1967, 1996 and 1999). For this reason, any errors in the rulings complained of were harmless.[15] However, the trial judge has considered the relatively small number of bakers doing business in the York area who were represented at the Harrisburg meeting in evaluating defendant's contention that the "sole purpose" of that meeting was to discuss "the deteriorating market condition in York" (see footnote 13 above).

Contention That The Trial Judge Erred In Applying the Rule of Reasonable Doubt (p. 22 of Staab's Brief, being Document 143 and p. 24 of Reply Brief, being Document 144)

■■■ Conviction beyond a reasonable doubt does not require conviction beyond all doubt and, hence, conviction is proper even if the fact finder has some doubt. See Murphy v. United States, 33 F.2d 896 (3rd Cir. 1929), cert. den. 280 U.S. 584, 50 S.Ct. 35, 74 L.Ed. 634 (1929). The trial judge has consistently used language such as the following in criminal charges which have been affirmed by the appellate courts:

"A Yes. He told Hershey just what I just said. He told Hershey it would be to everybody's advantage for them to get Mr. Dougherty up."

Boileau testified that Staab suggested that "we try to * * * raise the price of bread in Philadelphia" (N. T. 587–8). See, also, N. T. 801, 1072, 1074, 1296 and 1345–6. Witnesses such as Hershey were friends of Staab (N. T. 889) and would have had no reason to testify falsely in order to hurt him.

13. The trial judge was not required to accept the testimony of Mr. Staab at N. T. 1953–4, where he admitted this call to Allen. It seems strange that more bakers doing business in the York area

were not present, if the York market was the "sole" subject for discussion at the February 14 Harrisburg meeting, as contended by Staab (see N. T. 1905 and last full paragraph on page 2 of Reply Memorandum of Staab, being Document 144). Staab concedes that the Philadelphia market price of economy bread was discussed at the Harrisburg meeting (N. T. 1906).

14. See, also, authorities cited in Documents 77–79, 86–89, and 134.

15. The circumstances surrounding these rulings, which are believed to have been proper, are stated in an Appendix attached to this Memorandum Opinion.

"The term 'reasonable doubt' means such a doubt as will leave the juror's mind, after a candid and impartial consideration of all the evidence, so undecided that he or she is unable to say that he has an abiding conviction or reasonable assurance of the defendant's guilt. It is the kind of a doubt that would make you hesitate to act in matters of highest importance to you in your daily life. If you have a reasonable doubt, an honest reasonable doubt, after considering all the evidence, the defendant is entitled to the benefit of that doubt, and must be acquitted.

"On the other hand, members of the jury, it cannot be a fancied doubt, and a juror has no right to raise up false standards or to conjure up a doubt in order to escape the performance of an unpleasant duty. 'Beyond a reasonable doubt' does not mean beyond all doubt."

United States v. Rosenberg, D.C., 157 F. Supp. 654 (N.T. 581 of October 1957 trial).

See United States v. Rosenberg, 257 F.2d 760 (3rd Cir. 1958), aff'd. 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); United States v. Damiano, 290 F.2d 817 (3rd Cir. 1961); United States v. Jackson, 300 F.2d 758 (3rd Cir. 1962), cert. den. 374 U.S. 835, 83 S.Ct. 1882, 10 L.Ed.2d 1056 (1963); United States v. Bregman, 306 F.2d 653 (3rd Cir. 1962), cert. den. 372 U.S. 906, 83 S.Ct. 718, 9 L.Ed.2d 716 (1963).

The above-quoted language was applied in making the findings in this case.

The letters of September 12 and 20, 1963, have been attached to the backer of Staab's Reply Memorandum (Document 144). The letters of September 17 and 23 have been attached to the Government's Memorandum (Document 134).

An order denying the above post-trial motions will be filed at the time of imposing sentence on defendants, which

shall be at 4 P. M. on December 6, 1963, unless defendants request an earlier date.

## APPENDIX
## CONCERNING CROSS-EXAMINATION OF WITNESS FOX

Defendant Staab contends that the court erred by interfering with his order[a] of cross-examination of rebuttal witness Fox. His contention is that he wanted to lead up to a question, i. e., whether or not the witness knew of Staab's contrary testimony under oath.

The first several questions asked on cross-examination concerned statements the witness had given to the Government and the witness' testimony given on direct examination. Then counsel asked: "Now, did Mr. Sarbaugh tell you, or do you know that Mr. Staab has previously testified under oath * * *" (N.T. 1973). Government counsel objected (on grounds that it was not material what Sarbaugh told the witness; see N.T. 1966) and a side bar conference followed. At side bar, the court agreed that the defendant could ask whether the witness was presently aware of Staab's contrary testimony under oath and the question was phrased. In substance, this was the question that counsel had started to ask, but eliminating the reference to Mr. Sarbaugh. After side bar, instead of continuing with that question, which defense counsel had stated and agreed upon, he asked whether Fox was aware that Schulz was selling bread in Philadelphia and York (N.T. 1978) and then asked if the witness knew Staab to be honorable man. Ruling on the first question was reserved and an objection to the second question was sustained.[b]

■■ Counsel had been given permission to complete the question he had started, but declined to do so, and instead took another tack. The court then asked counsel to pursue that question which had been approved and discussed at side bar, i. e., would your testimony be different if you knew Staab testified to the

---

a. See page 20 of defendant's Reply Brief, Document 144.

b. Counsel was permitted to ask the witness if Staab was an accurate man.

contrary? When the question was asked, the witness stated that it would not. In the absence of some further explanation at side bar, there was no error in asking counsel to pursue first that which had been discussed and agreed upon. The orderly conduct of the trial is part of the court's duty.

At the conclusion of the witness' testimony, defense counsel was offered an opportunity to argue the question on which ruling had been reserved, but he declined to do so (N.T. 1986–7).